UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

RICHARD R. SINGH,

             Petitioner,

    v.

J. ROBERTSON, Warden,

             Respondent.

Case No.  18-cv-07622-YGR (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; AND DENYING CERTIFICATE OF APPEALABILITY**

## I.    INTRODUCTION

Petitioner Richard R. Singh brings this *pro* se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging the validity of a conviction obtained against him in state court and raising multiple claims.  Dkt. 1.  Thereafter, Petitioner filed an amended petition, which is the operative petition in this action.  Dkt. 21.

On April 10, 2015, a Monterey County jury convicted Petitioner of two counts of first degree murder, and the jury also convicted his codefendant, Jordan Killens[1] of one count of first degree murder.  The victims, Demetrius Safford and Navneal Singh,[2] were shot and killed on the night of August 11, 2013, on the side of Dunbarton Road in Aromas.  Petitioner was convicted of both murders; Killens was convicted of murdering only Safford.

Having read and considered the papers filed in connection with this matter and being fully informed, the Court hereby DENIES the amended petition as to all claims for the reasons set forth below.

## II.    BACKGROUND

### A.    Factual Background

The state appellate court handled the direct appeals filed by Petitioner and Killens in an

---

[1] Killens filed a separate federal habeas action, and his habeas petition was denied on the merits on November 16, 2020.  *See* Case No. 19-cv-02621 HSG (PR).

[2] Because Petitioner shares the same last name with one of the victims (Navneal Singh) and one of the witnesses (Reginald Singh), the Court will use Navneal and Reginald's first names for clarity.

United States District Court
Northern District of California

unpublished opinion and described the relevant facts as follows[3]:

> The prosecution presented the testimony of two eyewitnesses to the murders: Ronald Saxton and Eric Romero, both of who had gone to the scene of the murder with defendants, believing they were going to participate in a home invasion robbery.
>
> **A. Relationships**
> Romero, one of the eyewitnesses, had known defendants since elementary school, and he had known Saxton since high school. Saxton, the other eyewitness, had known defendant Killens, who was nicknamed "Liggz," since high school. Saxton had met defendant Singh through defendant Killens a few months before the Navneal and Safford murders. Saxton and defendants would "hang out" and smoke marijuana together. Saxton was the only one of the four who had a car—a black Lincoln.
>
> Victim Navneal lived in Sacramento. Reginald Singh, defendant Singh's brother, became friends with Navneal in 2010. Reginald introduced Navneal to defendant Singh. Defendant Singh referred to Navneal as "cousin," even though they were not actually related to each other.
>
> On July 4, 2013, defendant Singh attended a birthday party for Reginald in Sacramento. Romero and Saxton also attended the party. Navneal attended a later party at a motel room with Reginald, defendant Singh, Romero, and Saxton.
>
> **B. The Shooting—Initial Witnesses**
> At about 9:47 p.m. on August 11, 2013, Yvonne Cortez and her husband, Luis Sanchez, were driving home on Dunbarton Road. They saw two cars parked on the side of the road and four people standing in between the cars. One car was a black Lincoln LS. One of the cars had its hood open, and the other car had its trunk open. Two men were facing the other two men.
>
> A resident on Dunbarton Road heard 10 to 15 gunshots in rapid succession. Another area resident heard about five shots followed by three or four more shots. A third resident heard seven to nine shots.
>
> At about 10:15 p.m., an off-duty deputy sheriff called 911 after seeing two bodies on the ground behind a car on Dunbarton Road. Another deputy was dispatched to the scene, where he saw the victims' bodies

---

[3] This summary is presumed correct. *See Hernandez v. Small*, 282 F.3d 1132, 1135 n.1 (9th Cir. 2002); 28 U.S.C. § 2254(e)(1).

on the ground behind a gold Toyota sedan. The deputy observed bullet wounds to both victims' heads and bullet holes in the Toyota.

### C. Investigation

A detective was also dispatched to investigate the shootings. He located four .45–caliber brass bullet casings at the scene. Another detective found two additional .45–caliber casings the next day. A cell phone was found in the Toyota.

Forensic evidence technician Victor Lurz processed the vehicle. He observed evidence of four bullet strikes to the vehicle, likely made by three bullets, but he recovered only one bullet, from the trunk of the car.

About a year later, metal detectors were employed at the scene of the murder. Three more .45–caliber bullets and a seventh .45–caliber casing were located at that time. According to Monterey County Sheriff's Detective Rick Jorgensen, the evidence—including a bullet found in Navneal's head and a fragment found in Safford's head—indicated that eight bullets had been fired.

An autopsy revealed that Safford had been shot three times. One shot was to the back of the head. Bullet fragments were found in his skull. Safford had abrasions on his face that could have been caused by falling down and hitting his face on the ground. He also had a bullet wound in his back. The bullet had exited his chest. He had a third bullet wound in his right foot. A bullet had entered and exited one of Safford's shoes.

Navneal had also been shot three times. He had an entrance wound in the back of his head, from which a bullet was extracted. A second bullet had entered his right lower back and had exited his abdomen. The condition of the exit wound indicated that Navneal had been pressing up against something or lying on the ground. A third bullet had entered Navneal's leg just below the knee and exited his thigh.

Forensic scientist Adam Lutz analyzed five bullets from the murder. It was highly likely that all five bullets, which were all full metal jacketed bullets, were fired from the same gun. The bullets included one taken from Navneal's skull. Lutz also analyzed seven casings from the murder. He concluded it was likely that all of the casings came from the same gun as well. However, he could not rule out the possibility that there had been two guns because there was a potential eighth bullet strike.[FN 5]

[FN 5:] Lutz was given a hypothetical mirroring facts from the case, as follows: one bullet was found in "the skull of victim number one," a second bullet was found in the trunk of the car, three bullets were

found in the ground near "victim number one," there was a bullet strike on the car, there was a bullet strike on the muffler, there was a bullet fragment in "victim number 2's head," and there were seven casings. Lutz was asked if he could "rule out two guns or two shooters." Lutz said, "No," and explained that with "seven cartridge cases, eight bullet strikes," a second gun was "a possibility."

Lutz had looked at the bullet fragments taken from Safford's skull. He described them as "very small lead fragments." Lutz had not analyzed the bullet fragments with magnification or "the appropriate lighting," however, so he could not "give an opinion" on whether the bullet fragments found in Safford's skull were from a different type of bullet—i.e., not a full metal jacket bullet.[FN 6]

[FN 6:] Lutz was asked whether the "lead fragment" in Safford's skull "give rise to maybe a second type of bullet fired other than the full metal jacket bullets." Lutz responded, "That's speculative based on what I have done. Because I did not look at these fragments in the lab with magnification, with the appropriate lighting. So that would be a little bit of a stretch for me to give an opinion on that particular issue."

Defendant Singh did not attend Navneal's funeral. Prior to the funeral, Reginald asked defendant Singh if he had heard about Navneal's murder. Defendant Singh said he had no idea. At the funeral, Reginald got into an argument with his ex-girlfriend, Komal Prasad, who had had an affair with Navneal. Reginald told Prasad that he knew what had happened to Navneal and "who did it," and he told her that Navneal had been with defendant Singh on the night of the murders.

### D. Interview and Arrests of Defendant Singh

Defendant Singh was interviewed in late February 2014 at the Sheriff's Department. He received the *Miranda* warnings[FN 7] and agreed to talk. When asked if he knew about Navneal's murder, defendant Singh said he had heard about it from his brother Reginald, a few days after it happened. Defendant Singh had also seen news reports about the murders. Defendant Singh referred to Navneal as his "cus" or cousin.

[FN 7:] *Miranda v. Arizona* (1966) 384 U.S. 436.

Defendant Singh acknowledged that Navneal and Stafford had given him a ride from Sacramento to Monterey on the day of their murders. Defendant Singh said he had been dropped off at a smoke shop on Lighthouse Avenue between 1:00 p.m. and 3:00 p.m., and that Navneal and Stafford had told him they were going to go back to Sacramento. Defendant Singh then met up with a friend and went to Lovers Point, where he and the friend smoked marijuana. Defendant could not name the friend or say whether the friend was male or

4

female. Defendant Singh denied communicating with Navneal, through text messages or calls, after being dropped off.

Defendant Singh was arrested for the murders after his interview but was subsequently released due to insufficient evidence. He was arrested again on July 15, 2014.

### E. Cell Phone Evidence

Cell phone and cell tower records showed that defendant Singh and Navneal had communicated at about 12:15 p.m. on the day of the murders and that they had traveled from Sacramento to Monterey at around the same time that day.

At 7:23 p.m., defendant Singh's phone was in Marina. At 7:57 p.m., he called Navneal while in Seaside. He made additional calls from Seaside and then received calls from Navneal at 8:11 p.m. and 8:22 p.m. Subsequent calls to and from Navneal indicated that defendant Singh was moving north into Castroville and then east towards Salinas. Defendant Singh received a call from Navneal at 9:25 p.m., a call from Saxton at 9:33 p.m., and a call from Romero at 9:41 p.m. At 9:42 p.m., defendant Singh's phone made an outgoing call that went through a tower on Dunbarton Road. He also received a call that went through the Dunbarton Road tower at 9:45 p.m. At 10:08 p.m., defendant Singh made a call that went through the Dunbarton Road tower, but by 10:11 p.m., he was moving south. By 10:19 p.m., he was in Salinas, and at 10:34 p.m., he was in Marina.

Saxton called Romero at 7:18 p.m. on the day of the murders. Saxton's calls around that time were made from Seaside and Marina, as he was moving north. At 9:33 p.m., Saxton called defendant Singh from a location in Salinas.

Romero, too, was in the Seaside area at 7:18 p.m. on the day of the murders. Romero received several calls from defendant Singh between 8:00 p.m. and 8:14 p.m., while Romero was still in Seaside. Romero's phone made a call through a tower on Crazy Horse Canyon Road in Salinas at 9:41 p.m., and it received a call from a tower on Dunbarton Road in Aromas at 9:42 p.m. Romero's phone next made a call from Salinas at 10:25 p.m.

Between June 3, 2013 and August 11, 2013, defendant Singh and Navneal had made 166 calls to one another. After 10:15 p.m. on the day of the murders, there were no calls between them.

Defendant Singh got a new cell phone number three days after the murder. Saxton's last phone call to defendant Singh was on September 17, 2013.

Kayana Jackson was the girlfriend of defendant Killens in August 2013. In September 2013, defendant Killens sent Jackson a text message: "You mean a lot to me. But remember when I told you I did something and I wish I could tell you?" Jackson wrote back, asking what defendant Killens had done. Defendant Killens responded:

"Something that might fuck up our relationship. All I'm saying is what I did, I could be in jail for life and you don't deserve that." Jackson asked defendant Killens to tell her what he had done, but Killens indicated he would not do so over the phone.

In text messages the following day, defendant Killens again indicated he might tell Jackson what he had done. He also indicated that it might be "too real" for Jackson to understand.

About a week later, defendant Killens told Jackson he had shot and killed someone. Defendant Killens showed Jackson a gun that was in his bedroom dresser. The gun was a semiautomatic, "silver grayish" and "palm size."

Jackson was interviewed by the police in August 2014. Jackson told the police that defendant Killens had not talked to her about the murders. Upon further questioning, Jackson admitted that defendant Killens had told her he had shot or killed someone.

### F. Probation Search of Defendant Killens

On August 5, 2014, defendant Killens was under the supervision of the probation department with a search and seizure waiver. Probation officers conducted a search of his parents' home on that date. They examined defendant Killens's cell phone, including his text messages.

One outgoing text message to Jackson read, "I was taking a nap and my phone kept going off. They went to my granny's and said I had a warrant for the murder of two men. Delete these messages, all of them." Another outgoing message to Jackson read, "Na. That's stupid. All the freedom they're going to take from me. I'm staying out as long as I can." In response, Jackson asked, "Are they trying to get you for 25 years to [life]?" Defendant Killens's reply said, "Maybe. I don't know. Up to the judge."

The probation officers also opened up Facebook on defendant Killens's cell phone. An October 10, 2013 Facebook post by defendant Killens said, "I only fucc with a few niggas and all of em shoot niggas." An October 14, 2013 post by defendant Killens read, "My nigga said I got to have weed to fucc with him." Defendant Killens had "tagged" defendant Singh in that post as well as another one, dated October 13, 2013, which linked to a YouTube video. Defendant Singh had also tagged defendant Killens in a Facebook

6

post dated November 6, 2013, which said, "just stop it my nigga it aint coo lol." On December 11, 2013, defendant Killens had posted, "Ask [defendant Singh] he'll tell you everything you need to know when I go in. Lol." On June 16, 2014, defendant Killens had tagged defendant Singh in a video post, which said, "This finna be . . . fathers day . . . . . . aint nobody was trying to dance with her she was humping everything but a nigga . . . ." Defendant Killens had also accessed a Facebook link regarding the murders.

An August 5, 2014 Facebook message from defendant Killens to a person named Tran read, "I know shits crazy." The reply read, "He got caught with the same struzy you had?" Defendant Killens responded, "Sum like that." Tran's response asked, "Is he gonna drop a dime on you? Ha ha. Just kidding." The reply message from defendant Killens stated, "He already did." Another outgoing message from defendant Killens read, "It's bad for me right now. I'm trying to get to Hawaii." Other outgoing Facebook messages indicated that defendant Killens was "going to try to slide" (meaning leave) and that he needed to get out of the country.

Defendant Killens's cell phone also contained news articles regarding the arrest of defendant Singh for the murders of Navneal and Safford. The probation officers confiscated the cell phone.

### G. Saxton's Testimony

A detective located a black Lincoln LS at an apartment complex in Seaside on August 13, 2013. The Lincoln was registered to Ronald Saxton, who testified at trial under a grant of immunity.

A few weeks before the Navneal/Safford murders, Saxton was driving a car with defendant Singh. Saxton was arrested for possessing a gun, and he pleaded guilty, but at trial he claimed that the gun had actually belonged to defendant Singh.

On August 11, 2013, Saxton received a call from defendant Singh. Defendant Singh said he was coming down from Sacramento with his cousin and a friend. Saxton later exchanged text messages with defendant Singh, in which they discussed a plan to rob a house in Prunedale. Defendant Singh said a friend of his lived in the house and that there would be money and gold. Defendant Singh wanted Saxton to be the driver, and he wanted defendant Killens to come.

Saxton picked up defendants from the home of defendant Killens's grandmother. They then picked up Romero. While they were stopped for gas, defendant Killens said he had a gun and showed Saxton that he was carrying a gun, which appeared to be a revolver. Defendant Singh talked about meeting up with his cousin and a friend, who would be helping with the robbery. Defendant Singh said his cousin

United States District Court
Northern District of California

7

had a gun.

Defendant Singh directed Saxton to drive to Prunedale. They contacted a car that was stopped on a back road. Defendant Singh got out of Saxton's car and went inside the other car for a while, then returned to Saxton's car. Both cars then drove off, with Saxton's car in the lead and defendant Singh directing him where to go. On another back road, Saxton pulled the car over. The other car parked in front of him. Defendants and Romero exited Saxton's car, and two people—Navneal and Safford—got out of the other car.

Saxton watched the group talk and smoke cigarettes for a while. Romero then returned to Saxton's car. The others continued to talk. Navneal then took out a gun and passed it to defendant Singh.

After about 10 to 12 minutes, the group shook hands, and defendants walked back towards Saxton's car. Defendants then turned around and shot at Navneal and Safford, whose backs were turned. Navneal and Safford "dropped." Saxton heard about eight shots and believed that both defendants fired guns. Saxton described the gun that defendant Singh had used as a black gun with a big barrel—likely a .45–caliber.

After the shooting, defendants got back into Saxton's car. Defendant Singh told Saxton, "Go before I leave you here, too." Saxton drove defendants to Romero's neighborhood, where defendants and Romero got out of the car. The others instructed Saxton not to say anything.

Saxton stopped hanging out with defendant Singh after the murders, but he continued to have telephone contact with defendant Singh, in order to "keep it cool."

Saxton was arrested and interviewed five times about the murders. During the first three interviews, he did not tell the truth because he was scared of defendants. In the first interview, he denied having seen Navneal or Safford and denied having been to Dunbarton Road. In the second interview, he admitted having driven defendant Singh to Dunbarton Road, saying he had given him a ride to a party. After Saxton was arrested and booked for being an accessory to murder, he told the police he had given defendant Singh a ride to meet his cousin on Dunbarton Road, and he told the police that defendant Singh had shot two people. After the police told Saxton that Romero was in custody, Saxton admitted that Romero had been present. Saxton later acknowledged that he had also driven defendant Killens to the scene of the murders, but he told the police that only defendant Singh had shot the victims. At the time, defendant Killens was still out of custody. Eventually, after hearing that both defendants were in custody, Saxton gave another statement, in which he told the truth:

8

that both defendants had shot at the victims.

According to Monterey County Sheriff's Detective Martin Opseth, Saxton's first interview was on July 22, 2014. Saxton admitted knowing defendant Singh and Romero, and he admitted dropping defendant Singh off on Dunbarton Road, saying he believed defendant Singh was going to a party.

### H. Romero's Testimony

Romero was in a witness relocation/protection program when he testified at trial.

On the day of the murders, Romero went to go hang out with defendants and Saxton. The other three picked Romero up, and at some point they met up with another car, which started following them. Both cars pulled over, and defendant Singh got into the other car. Both cars then began driving again, with defendant Singh giving Romero directions over the phone, which Romero relayed to Saxton, the driver. Both cars eventually pulled off on Dunbarton Road. Saxton parked behind the other car, and everyone exited the cars except Saxton. Romero realized he had met one of the men from the other car about a month earlier, in Sacramento.

Romero, defendants, and the victims stood in a circle, smoking, outside of the cars. Defendants and the victims discussed plans for a home invasion robbery. Safford then pulled out a gun—a black semiautomatic, showed it to the others, and handed it to Navneal, who then handed it to defendant Singh. Defendant Singh checked the clip for bullets, then cocked the gun. Defendant Killens then pulled out a silver revolver and showed it to everyone. At that point, Romero returned to Saxton's car.

Romero saw defendants shake hands with the victims as if they were saying goodbye. The victims then began walking towards their car. Defendants then pulled out guns and shot the victims. The victims both "dropped," and defendants returned to Saxton's car.

Defendant Singh came back to Romero's house after the murders. Defendant Singh left after five or ten minutes, but returned later to spend the night. When defendant Singh returned, he no longer had the gun, but he had a "lump sum of money."

Romero continued to have contact with defendant Singh following the murders but slowly disassociated with him. Romero had heard defendants "plotting on" Saxton after Saxton had "cut [them] off," and he was scared. Romero acknowledged, however, that he was with defendant Singh in March of 2014 when the police stopped a car in which they were riding. Romero was in possession of ecstasy and

9

heroin at the time, leading to drug possession charges.

Romero was interviewed twice by the police. During his first interview, on July 31, 2014, Romero told the police that he and Saxton had picked up defendant Singh from Dunbarton Road. Romero denied being present during the murders or bringing defendant Singh to the site, and he denied knowing the victims. Romero did not name defendant Killens: he was scared of defendant Killens, who was still out of custody.

During his second interview, on August 8, 2014, Romero named both defendants. Defendant Killens was not in custody yet; he was arrested three days later. No promises were made to Romero, but Detective Opseth did say he would try to help Romero by talking to the District Attorney about his pending cases. At the time, Romero had pending charges involving possession of stolen property and possession for sale of narcotics. The charges were dismissed after Romero testified at the preliminary hearing.

At trial, Romero admitted that some of his testimony at the preliminary hearing had not been "the full truth." He had "misremembered." For instance, he had previously testified that the group went to Salinas before going to Dunbarton Road, but he was no longer sure that was accurate.

### I. Defense Witnesses
Defendant Killens's mother testified that defendant Killens lived with her and his grandmother in Seaside during August 2013. They moved to another Seaside residence in October 2013.

Shannon Langley was close friends with Safford and was living with him in August 2013. On August 11, 2013, Safford left the house, then came back with Navneal. Safford took his .45–caliber gun with him when he and Navneal later drove away.

*See People v. Singh, et al.*, No. H042511, 2018 WL 1046260, at *2-8 (Cal. Ct. App. Feb. 26, 2018) (footnotes in original).

### B.    Procedural History

#### 1.    Conviction and Sentencing

As mentioned above, a Monterey County jury found Petitioner guilty of two counts of first-degree murder with special circumstances of lying in wait and multiple murder (Cal. Penal Code §§ 187, 190.2(a)(3) & (15)), and found true multiple personal use of a firearm enhancement

1    allegations as to both counts.[4]  2 Clerk's Transcript ("CT") 564-573.  On June 24, 2015, the trial

2    court sentenced him to life without the possibility of parole plus fifty years to life.  3CT 611-612.

3                    **2.  Post-Conviction Appeals and Collateral Attacks**

4         Petitioner appealed and filed a state habeas petition in the California Court of Appeal.

5    3CT 660-661, Resp't Ex. 8.  In an unpublished decision dated October 2, 2017, the California

6    Court of Appeal upheld the murder convictions and special circumstances enhancements, but

7    reversed and remanded the matter to the trial court for resentencing by striking the firearm

8    enhancements (Cal. Penal Code § 12022.53(d) & (e)), and imposing a previously stayed firearm

9    enhancement (Cal. Penal Code § 12022.53(c)).  Resp't Ex. 9.  The California Court of Appeal

10   denied the state habeas petition on the same day.  Resp't Ex. 10.

11        On October 31, 2017, the California Court of Appeal issued an order modifying its opinion

12   with no change in the judgment and denying rehearing.  Resp't Ex. 11.

13        Petitioner filed petitions for review of the decision on appeal and the denial of the state

14   habeas petition in the California Supreme Court.  Resp't Exs. 12 & 13.  On January 17, 2018, the

15   California Supreme Court denied review of the denial of the state habeas petition.  Resp't Ex. 14.

16   On the same day, the California Supreme Court granted review of the decision on appeal and

17   remanded to the California Court of Appeal with directions to vacate its decision and further

18   consider the cause in light of California Senate Bill 620.  Resp't Ex. 15.

19        On February 26, 2018, the California Court of Appeal again affirmed the convictions but

20   reversed and remanded to the trial court for resentencing to strike the California Penal Code

21   § 12022.53(d) and (e) enhancements and to consider exercising its discretion to strike the

22   previously stayed California Penal Code § 12022.53(c) enhancements.[5]  Resp't Ex. 16.

23        On June 19, 2018, the trial court resentenced Petitioner to life without parole consecutive

24   to 40 years.  Resp't Ex. 17.

---

[4] The jury also found Killens guilty of one count of first-degree murder with the special circumstance of lying in wait and personal use enhancements.  2CT 574-583.

[5] The state appellate court incorporated the modifications made in its October 31, 2017 Order into its February 26, 2018 Order.

United States District Court
Northern District of California

### 3.  Federal Court Proceedings

On December 19, 2018, Petitioner filed the instant federal habeas petition raising eleven claims.  Dkt. 1.

This matter was originally assigned to Magistrate Judge Susan van Keulen.  Dkt. 2. Thereafter, the case was reassigned to the undersigned.  Dkt. 4.

On May 13, 2019, Respondent filed a motion to dismiss the habeas corpus petition for failure to exhaust state remedies, in which Respondent argued that some of Petitioner's claims should be dismissed as unexhausted.  Dkt. 9.  Petitioner filed his opposition, and Respondent filed a reply.  Dkts. 12, 14.

On August 14, 2019, Petitioner filed a motion for leave to amend his petition to delete the unexhausted claims.  Dkt. 16.

On September 11, 2019, Respondent also filed an administrative motion to relate Killens's pending federal habeas action, Case No. 19-cv-02621 HSG (PR),  because, as mentioned above, Petitioner and Killens were tried together in state court.  Dkt. 17.  On September 18, 2019, the Court filed an order determining that the cases were not related.  Dkt. 18.

On October 18, 2019, Petitioner filed a proposed amended petition alleging only unexhausted claims.  Dkt. 19.

On November 2019, the Court granted Petitioner's motion to amend his petition to delete the unexhausted claims, and denied Respondent's motion to dismiss as moot.  Dkt. 20.  The Court directed the Clerk of the Court to file his proposed amended petition, which the Clerk docketed as a separate document, labeled "Amended Petition."  *See* Dkt. 21.  Petitioner raised the following claims in his amended petition: (1) admission of false and irrelevant evidence; (2) prosecutorial misconduct based on the introduction of false or misleading evidence; (3) prosecutorial misconduct for misrepresenting testimony on ballistics evidence; (4) ineffective assistance of trial counsel for failing to object to prosecutor's argument regarding the circumstantial evidence instruction; (5) prosecutorial misconduct for misrepresenting and eliciting inadmissible evidence in the form of text messages between Petitioner and Navneal; (6) ineffective assistance of trial counsel for failing to object to prosecutor's remarks in closing argument regarding "lesser

1   criminals"; (7) cumulative error; and (8) pervasive prosecutorial error.  *See id.*

2          On February 25, 2020, Respondent filed an answer.  Dkts. 24, 24-1.  Even though

3   Petitioner was given the opportunity to do so, he has not filed a traverse, and the time frame for

4   doing so has passed.  This matter is fully briefed and ripe for adjudication.

5   **III.    LEGAL STANDARD**

6          A federal court may entertain a habeas petition from a state prisoner "only on the ground

7   that he is in custody in violation of the Constitution or laws or treaties of the United States."  28

8   U.S.C. § 2254(a).  Under the Antiterrorism and Effective Death Penalty Act ("AEDPA") of 1996,

9   a district court may not grant a petition challenging a state conviction or sentence on the basis of a

10  claim that was reviewed on the merits in state court unless the state court's adjudication of the

11  claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of,

12  clearly established Federal law, as determined by the Supreme Court of the United States; or

13  (2) resulted in a decision that was based on an unreasonable determination of the facts in light of

14  the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  The first prong

15  applies both to questions of law and to mixed questions of law and fact, *see Williams (Terry) v.*

16  *Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual

17  determinations, s*ee Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

18         A state court decision is "contrary to" Supreme Court authority, that is, falls under the first

19  clause of section 2254(d)(1), only if "the state court arrives at a conclusion opposite to that

20  reached by [the Supreme] Court on a question of law or if the state court decides a case differently

21  than [the Supreme] Court has on a set of materially indistinguishable facts."  *Williams (Terry)*, 529

22  U.S. at 412-13.  A state court decision is an "unreasonable application of" Supreme Court

23  authority, falling under the second clause of section 2254(d)(1), if it correctly identifies the

24  governing legal principle from the Supreme Court's decisions but "unreasonably applies that

25  principle to the facts of the prisoner's case."  *Id.* at 413.  The federal court on habeas review may

26  not issue the writ "simply because that court concludes in its independent judgment that the

27  relevant state-court decision applied clearly established federal law erroneously or incorrectly."

28  *Id.* at 411.  Rather, the application must be "objectively unreasonable" to support granting the writ.

United States District Court
Northern District of California

*Id.* at 409.

Under the second prong, *see* 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. at 340; *Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000). Moreover, "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

On federal habeas review, AEDPA "imposes a highly deferential standard for evaluating state-court rulings" and "demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal quotation marks omitted). Even if constitutional error is established, habeas relief is warranted only if the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Penry v. Johnson*, 532 U.S. 782, 795-96 (2001) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993)).

In applying the above standards on habeas review, the Courts in this Circuit look to the decision of the highest state court to address the merits of the petitioner's claim in a reasoned decision. *See Wilson v. Sellers,* __ U.S. __, 138 S. Ct. 1188, 1192 (2018); *LaJoie v. Thompson*, 217 F.3d 663, 669 n.7 (9th Cir. 2000). When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the Court looks to the last reasoned opinion. *Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000). Thus, a federal court will "look through" the unexplained orders of the state courts rejecting a petitioner's claims and analyze whether the last reasoned opinion of the state court unreasonably applied Supreme Court precedent. *See Ylst*, 501 U.S. at 804-06; *LaJoie*, 217 F.3d at 669 n.7. The last reasoned decision in this case is the California Court of Appeal's unpublished disposition issued on February 26, 2018, in which the state appellate court considered all of Petitioner's claims. *See Singh, et al.*, 2018 WL 1046260, at *11-31.

## IV.    DISCUSSION

### A.    Admission of False and Irrelevant Evidence

#### 1.    Background

Petitioner claims that the admission of evidence of Facebook messages between Killens and Tran violated his right to due process because they were false[6] and irrelevant.  Dkt. 21 at 7-8.[7]

#### a.    State Court Opinion

The state appellate court summarized the messages and trial court proceedings as follows:

> Defendant Singh challenges the admission of the messages exchanged via Facebook between defendant Killens and Tran.[FN 8] As noted above, the messages were exchanged on August 5, 2014, shortly after the arrest of defendant Singh on July 15, 2014. The messages referenced "shit[]" being "crazy," someone getting "caught with the same struzy you had," the fact that someone had "drop[ped] a dime" on defendant Killens, and the fact that Killens was trying to get to Hawaii or out of the country because things were "bad" for him.

> [FN 8:] Tran was identified by his full name, Clinton Tran, in the prosecution's in limine motion, where he was described as an "unknown person named 'Clinton Tran.'" At trial, Tran was referred to as "a person by the name of Tran."

> Defendant Singh contends these messages falsely suggested that defendant Singh had implicated himself and defendant Killens. He argues the messages were inadmissible hearsay and that their admission violated his Fourteenth Amendment right to due process and a fair trial.

> *1. Proceedings Below*

> The prosecution's motions in limine included a motion to admit the text messages and Facebook messages found on defendant Killens's cell phone during the probation search, which included the messages he had exchanged with his girlfriend, Jackson, and Tran. In addition to the Facebook messages that were admitted at trial, the prosecution originally sought to introduce four messages that preceded those admitted at trial. The messages began with one from Tran to

---

[6] The Court will discuss Petitioner's claim that the messages were false in the next section of this Order, which addresses Petitioner's prosecutorial misconduct claim.  *See infra* Discussion Part IV.B.3.a.

[7] Page number citations refer to those assigned by the Court's electronic case management filing system and not those assigned by the parties.

defendant Killens: "has he called u back, & your boy rich in tha news." The next message was from defendant Killens to Tran: "Oh yup." Defendant Killens also wrote, "[S]end me the link." Tran responded, "they caught him on the 2 murders or some shit."

Both defendants objected to admission of all the Facebook messages between defendant Killens and Tran. Defendant Killens filed a motion in limine to exclude all data obtained from his Facebook account. Defendant Singh objected to the admission of any statements by defendant Killens on the grounds that such statements were hearsay as to him and that their admission would constitute a confrontation clause violation unless defendant Killens and Tran testified. Defendant Singh also argued that the meaning of the word "struzy" was "speculative," such that "[s]omebody is going to have to interpret that." At a subsequent hearing, however, he noted that he understood "the struzy to mean gun" and that the jury would know that the "drop a dime" message meant that defendant Singh had "snitched on" defendant Killens.

The prosecutor argued that the messages from Tran were not being offered for their truth but rather to give context to defendant Killens's messages. The prosecutor subsequently told the trial court he was no longer seeking to introduce the first four messages because they were from "another person," not Tran.

The trial court found that the message "saying he gonna drop a dime on you" was asking defendant Killens whether defendant Singh was "going to implicate you in this murder." The trial court found that admission of the Facebook messages would not violate defendant Singh's confrontation clause rights under *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*) or *Bruton v. United States* (1968) 391 U.S. 123 (*Bruton*) and *People v. Aranda* (1965) 63 Cal. 2d 518 (*Aranda*).[FN 9] The trial court further found that the messages were admissible under the hearsay exceptions for adoptive admissions and declarations against interest. The trial court found that the statements were reliable in light of the "surrounding circumstances," which included the fact they were made close to the time of defendant Singh's arrest.

[FN 9:] Although defendant Singh briefly discusses *Crawford, Bruton,* and *Aranda* in his briefs, he does not make a confrontation clause argument on appeal.

During the jury instruction conference, counsel for defendant Singh requested the trial court preclude the prosecutor from arguing that defendant Singh "did drop a dime on somebody." The prosecutor indicated he would not make such an argument. The prosecutor thereafter told the jury that "drop a dime" meant snitching, that a "struzy" was a gun, and that the "drop a dime" message was a

16

reference to defendant Singh.

*Singh, et. al.*, 2018 WL 1046260, at *11-12 (brackets added).

b.        **Summary of Facebook Messages**

The following record describes the relevant Facebook messages from August 5, 2014, as taken from Investigator Peter Austen upon direct examination.  12 Reporter's Transcript ("RT") 3412-3416.  Lines 1-4 of the conversation were ultimately not admitted into evidence because they were between Killens and another person named Nanny Mamas.  5RT 1203.

**August 5, 2014 Facebook Messages Between Killens and Mamas**
**That Were Not Admitted Into Evidence:**

(1)  Mamas to Killens — "has he called u back, & your boy rich in tha news.
(2)  Killens to Mamas — "Oh yup."
(3)  Killens to Mamas — "[S]end me the link."
(4)  Mamas to Killens — "they caught him on the 2 murders or some shit"

2CT 420; 5RT 1203; 1 Augmented Clerk's Transcript ("ACT") 23.

**August 5, 2014 Facebook Messages Between Killens and Tran**
**That Were Admitted Into Evidence:**

(5) Killens to Tran — "I know shits crazy right now" and "I know shits crazy"
(6) Tran to Killens — "He got caught with the same streezy you had?"
(7) Killens to Tran — "Sumn lyk yat"
(8) Tran to Killens — "He gon drop a dime on you haaha jk"
(9) Killens to Tran — "He already did"
(10) Tran to Killens — "Wtf"
(11) Killens to Tran — "Yup frfr"
(12) Killens to Tran — "Its bad for me right now im trying to get to Hawaii"
(13) Tran to Killens — "Shoot out here im finna go to sac on Thursday and fuck wit jose"
(14) Tran to Killens — "His Homie Supposed to fix my whip"
(15) Killens to Tran — "Fasho. Ima try to slide"
(16) Tran to Killens — "Maybe stay a few days too"
(17) Killens to Tran — "Fasho I need to get out of this county"
(18) Tran to Killens — "Fasho find ur way Thursday ima go forsure"

12RT 3412-3416 (spelling and syntax in original); 1ACT 23.

17

### 2. Applicable Law

The admission of evidence is not subject to federal habeas review unless a specific constitutional guarantee is violated, or the error is of such magnitude that the result is a denial of the fundamentally fair trial guaranteed by due process. *Henry v. Kernan*, 197 F.3d 1021, 1031 (9th Cir. 1999); *Colley v. Sumner*, 784 F.2d 984, 990 (9th Cir. 1986). Evidence violates due process only if "there are no permissible inferences the jury may draw from the evidence." *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991). Evidence must "be of such quality as necessarily prevents a fair trial" for its admission to violate due process. *Id.* (quoting *Kealohapauole v. Shimoda*, 800 F.2d 1463, 1465 (9th Cir. 1986)).

Notwithstanding the above, the Ninth Circuit has observed that:

> The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process. Although the Court has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair, it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ.

*Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (internal citation omitted) (finding that trial court's admission of irrelevant pornographic materials was "fundamentally unfair" under Ninth Circuit precedent but not contrary to, or an unreasonable application of, clearly established federal law under section 2254(d)); *see also, Zapien v. Davis*, 849 F.3d 787, 794 (9th Cir. 2015) (because no Supreme Court case established the fundamental unfairness of admitting multiple hearsay testimony, *Holley* bars any such claim on federal habeas review). Therefore, "[u]nder AEDPA, even clearly erroneous admissions of evidence that render a trial fundamentally unfair may not permit the grant of federal habeas corpus relief if not forbidden by 'clearly established Federal law,' as laid out by the Supreme Court." *Id.* (quoting 28 U.S.C. § 2254(d)).

Additionally, failure to comply with state rules of evidence is neither a necessary nor a sufficient basis for granting federal habeas relief on due process grounds. *Henry*, 197 F.3d at 1031; *Jammal*, 926 F.2d at 919. While adherence to state evidentiary rules suggests that the trial was conducted in a procedurally fair manner, it is certainly possible to have a fair trial even when state standards are violated. *Perry v. Rushen*, 713 F.2d 1447, 1453 (9th Cir. 1983). The due

process inquiry in federal habeas review is whether the admission of evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair. *Walters v. Maass*, 45 F.3d 1355, 1357 (9th Cir. 1995). But only if there are no permissible inferences that the jury may draw from the evidence can its admission violate due process. *See Jammal*, 926 F.2d at 920.

### 3.   Analysis

First, Petitioner claims that the Facebook messages between Killens and Tran "had nothing to do with the facts of the murder case before the jury, thus making the conversation irrelevant," and their admission was a violation of his due process rights. Dkt. 21 at 7-8. Petitioner also takes issue with the fact that the first four lines, which the prosecutor sought to introduce initially before deciding against doing so because they were not between Killens and Tran, "became enmeshed in the [trial] court[']s admissibility analysis." *Id.* at 8. The state appellate court rejected Petitioner's aforementioned arguments upon determining that the Facebook messages admitted into evidence were relevant because they were made shortly after Petitioner's arrest, and that the jury would understand the meaning of "streezy" and "drop[ped] a dime," stating as follows:

> Defendant Singh first argues that the Killens/Tran Facebook messages were not admissible once the prosecution indicated it would not be introducing the first four messages, which referenced defendant Singh being "in tha news" and having been "caught . . . on the 2 murders." Defendant Singh argues that without the first four messages, the remaining messages could not have any meaning that was relevant to disputed issues at trial. However, the jury could rationally have inferred that the messages referenced defendant Singh's arrest for the murders. The jury knew that defendant Singh had been rearrested for the murders in July 2014 and that the messages were exchanged shortly thereafter, on August 5, 2014. Thus, the jury could rationally infer that the references to someone being caught with a "struzy" (or "streezy") and someone having "drop[ped] a dime" on defendant Killens were references to defendant Singh.
>
> Defendant Singh next argues that the Facebook messages should not have been admitted because the jury would not have been aware of the meaning of the word "streezy" (or "struzy") or the phrase "drop a dime." However, the trial court appeared to believe it was common knowledge that "drop a dime" meant "to implicate," and defendant Singh's trial counsel explicitly argued that the jury would understand that "struzy" meant a gun and that "drop a dime" meant "snitched."

*Singh, et. al.*, 2018 WL 1046260, at \*12-13. The state appellate court also acknowledged that the first four lines of Facebook messages were not admitted into evidence, and it pointed out that the

19

prosecutor corrected his initial representation about the first four lines *prior to* the trial court ruling on the admissibility of the remaining lines.  *Id.* at \*30-31.  This Court finds that the state appellate court was reasonable in rejecting Petitioner's aforementioned arguments.  The state appellate court reasonably determined that the remaining messages were relevant because "the jury could rationally have inferred that the messages referenced [Petitioner's] arrest for the murders."  *Id.* at \*12.  Thus, the state appellate court was objectively reasonable in concluding that the admission of the remaining messages did not violate due process.  *Id.*  The jury could draw a permissible inference from the evidence: because the messages were sent after Petitioner was arrested any references to someone being caught with a "streezy" (gun) or "drop[ping] a dime" (snitching) on Killens were references to Petitioner.  Accordingly, this was not an instance in which no permissible inference could be drawn from the evidence.  *See Jammal*, 926 F.2d at 920.

Secondly, Petitioner claims that the Facebook messages between Killens and Tran were inadmissible hearsay and the trial court erred when admitting such evidence, violating his constitutional rights to due process.  Dkt. 21 at 8.  Upon review of the state's evidentiary laws, the state appellate court found that the messages were admissible under the hearsay exceptions, and that their admission did not violate due process.  The state appellate court explained its reasoning as follows:

> Defendant Singh next argues that the prosecution failed to meet the requirements of the declaration against interest exception because there was no showing that Tran was unavailable. However, the record is clear that Tran's messages were admitted as adoptive admissions by defendant Killens, not as declarations against interest.

> Defendant Singh also argues that the adoptive admissions exception did not apply to Tran's messages, because Tran indicated he was "just kidding" when he asked, "Is he gonna drop a dime on you?" However, the relevant consideration here is whether defendant Killens, "by words or other conduct," adopted Tran's statements. (Evid. Code, § 1221.) Even if Tran was "kidding," the trial court reasonably found that defendant Killens's response—"He already did"—was an adoption of the truth of Tran's statement.

> Defendant Singh also points out that there was no evidence at trial showing that defendant Singh in fact implicated (i.e., "drop[ped] a dime on") defendant Killens. He contends the trial court therefore

erred in finding that the statement was reliable. As a reviewing court, we generally "'focus[ ] on the ruling itself and the record on which it was made,'" not on "'subsequent matters.'" (*People v. Berryman* (1993) 6 Cal. 4th 1048, 1070, overruled on other grounds by *People v. Hill* (1998) 17 Cal. 4th 800, 822–823 & fn. 1 (*Hill*).) Moreover, the trial court did not need evidence that defendant Singh did implicate defendant Killens in order to find that the Facebook messages were reliable. The trial court needed to find only that the statements were trustworthy in light of "'the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant.' [Citation.]" (*Geier, supra,* 41 Cal. 4th at p. 584.) Here, the statements were made in a private communication, close in time to defendant Singh's arrest. Taken together, the statements showed defendant Killens was admitting culpability in the crimes for which defendant Singh had been arrested. On this record, the trial court reasonably found that the statements were reliable.

*Singh, et. al.*, 2018 WL 1046260, at *13.

During the motions *in limine*[8] hearings, the trial court admitted the messages under the hearsay exceptions of adopted admissions and declarations against interest and found them to be "reliable in light of the 'surrounding circumstances." 5RT 1203-1207; *Singh, et. al.*, 2018 WL 1046260, at *12. A state court's determination of state law is binding on this Court. *See Hicks v. Feiock*, 485 U.S. 624, 629 (1988). The trial court applied a three-step analysis, pursuant to *Cervantes*[9] to determine whether the statements were admissible under state law and exceptions to the hearsay rule. 5RT 1205. First, the trial court found the Facebook messages between Killens

---

[8] The prosecution filed a motion *in limine* to admit the Facebook messages, and Petitioner filed a motion to exclude the messages. 2CT 419-422, 435-436.

[9] In *People v. Cervantes*, a non-testifying codefendant, Morales, inculpated himself and his two codefendants, Cervantes and Martinez, in a murder and an attempted murder while speaking to a friend of all three defendants, Ojeda. *See* 118 Cal. App. 4th 162, 166-67 (2004). On appeal the two codefendants contended that Morales's statement to the friend should have been excluded. *Id.* at 169. In order to determine whether the trial court properly admitted Morales's testimony, the state appellate court first analyzed whether the out-of-court statement was testimonial or nontestimonial in nature. *See* 118 Cal. App. 4th 162, 172-73 (2004). Second, after finding the statement to be nontestimonial, the state appellate court then determined whether or not the statement fell within a hearsay exception. *Id.* at 173. Third, the state appellate court analyzed, under de novo review of the totality of the circumstances, whether the statement bore sufficient indicia of trustworthiness so as to render the evidence admissible. *Id.* at 173-74. The court found that the trial court did not err in admitting the statement because it qualified as a declaration against penal interest and satisfied the constitutional standard of trustworthiness. *Id.* at 175.

United States District Court
Northern District of California

and Tran to be non-testimonial because they were a conversation between two individuals, distinguishing them from the examples of "testimonial statements" provided in *Crawford*.[10]  5RT 1204.  Second, pursuant to state evidentiary law, the trial court found the messages to fall within two separate hearsay exceptions: (1) adoptive admissions,[11] and (2) statements against interest.[12]  5RT 1205-1206.  Third, in the totality of the circumstances, because the messages were exchanged within a day of Petitioner's arrest, the trial court determined the found that the statements were reliable and displayed a sufficient indicia of trustworthiness.  5RT 1206.  The state appellate court noted the statements were made in a private communication, close in time to Petitioner's arrest, and the statements showed that Killens was admitting culpability in the crimes for which Petitioner was arrested.  *Singh, et. al.*, 2018 WL 1046260, at *13.  Thus, the state appellate court determined that "[o]n this record" the trial court "reasonably found that the statements were reliable."  *Id.*

Petitioner has not shown that the state appellate court's determination was objectively unreasonable.  Assuming *arguendo* that the admission of Facebook messages did not adhere to state evidentiary laws, such compliance is neither a necessary nor a sufficient basis for granting federal habeas relief on due process grounds.  *Henry*, 197 F.3d at 1031.  As stated above, the due process inquiry in federal habeas review is whether the admission of evidence was so arbitrary or

---

[10] *Crawford v. Washington*, 541 U.S. 36, 51-52 (2004) (Testimonial statements may include: "*ex parte* in court testimony or its functional equivalent—that is material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially" or "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.").

[11] California Evidence Code §1230 provides, "Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, was so far contrary to the declarant's pecuniary or proprietary interest, or so far subjected him to the risk of civil or criminal liability, or so far tended to render invalid a claim by him against another, or created such a risk of making him an object of hatred, ridicule, or social disgrace in the community, that a reasonable man in his position would not have made the statement unless he believed it to be true."

[12] California Evidence Code §1221 provides, "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth."

United States District Court
Northern District of California

prejudicial that it rendered the trial fundamentally unfair. *See Walters*, 45 F.3d at 1357.  Here, the introduction of the Facebook messages was subject to a limiting instruction, where the jury was only allowed to consider the messages for the context of Killens's statements of guilt, not for the facts of the murder.  3RT 622-625, 4RT 904-905.  Additionally, the jury was also instructed that Killens's pretrial statements could only be considered against him, not against Petitioner.  14RT 1319.  Because the Court assumes the jury followed limiting instructions, any prejudicial effect flowing from the trial court admitting the Facebook messages was ameliorated upon notice, and thus the admission of such evidence was not so arbitrary or prejudicial that it rendered the trial fundamentally unfair. *See Tan v. Runnels*, 413 F.3d 1101, 1115 (9th Cir. 2005) ("we presume jurors follow the court's instructions absent extraordinary situations"); *United States v. Mende*, 43 F.3d 1298, 1302 (9th Cir. 1995) (admission of testimony following a limiting instruction was not an abuse of discretion because based on the presumption that the jury will follow the district court's limiting instructions).

Finally, even if the Facebook messages at issue should have been excluded, such an error was harmless under *Brecht* in light of the overwhelming evidence of Petitioner's guilt of the two counts of first-degree murder.  *See* 507 U.S. at 637.  Saxton and Romero gave similar descriptions on the day of the murders.  Both eyewitnesses testified that Petitioner communicated with the other participants and gave directions to the murder location.  8RT 2300-2314, 10RT 2809-2816.  Both also testified that Petitioner fired shots from a gun that Navneal had just handed him.  8RT 2319-2326, 10RT 2818-2824, 2827.  Phone records showed that between June 3 and August 11, 2013, Petitioner and Navneal communicated or attempted to communicate with each other 166 times, but after 10:15 p.m. on the day of the murders, Petitioner made no calls to Navneal.  12RT 3419-3421.  Navneal had also communicated with Petitioner several times on the day of the murders.  1ACT 24-27; 12RT 3346, 3367, 3370-3373, 3437-3443.  Although Petitioner told the police he did not communicate with Navneal by phone or text after he was dropped off in Monterey between 1:00 and 3:00 p.m., the phone records showed several communications between them just before the murders.  1ACT 25-27, 8RT 2166, 2173.  Petitioner received a call from Navneal at 9:25 p.m., a call from Saxton at 9:33 p.m., and a call from Romero at 9:41 p.m.

12RT 3373-3375.  At 9:42 p.m., Petitioner made a call to Romero, which bounced off the tower closest to the murders, and at 9:45 p.m. he received a call from Romero, which bounced off the same tower.  12 RT 3375.  The next call Petitioner made or received was an outgoing call at 10:08 p.m., which bounced off the same tower.  1ACT 27, 12RT 3375-3376.  Petitioner's brother Reginald told Prasad (Reginald's ex-girlfriend) that Petitioner said he was with Navneal the night of the murders.  10RT 2711-2712.  In light of the overwhelming evidence, even assuming *arguendo* the admission of the messages had violated Petitioner's right to due process, any such error did not have a substantial and injurious effect on the jury's verdict under *Brecht*.  *See* 507 U.S. at 637-38.

For these reasons, the Court DENIES this claim, and Petitioner is not entitled to habeas relief.

### B.    Prosecutorial Misconduct—Introduction of False/Misleading Evidence

Petitioner raises multiple claims of prosecutorial misconduct against Deputy District Attorney Doug Matheson for various acts of misconduct during the trial.  *See* Dkt. 21.  This first claim deals with the introduction of allegedly false or misleading evidence during various parts of the trial.  *Id.* at 8-10.  The Court will address the other prosecutorial misconduct claims in the order Petitioner has raised them in his amended petition.  *See id.* 10-11, 12-13.

#### 1.    Background

Petitioner claims that the prosecutor violated due process when he: (1) introduced false evidence by requesting the admission of evidence of the Facebook messages between Killens and Tran; (2) made false statements that Petitioner was caught with Killens's gun and made admissions to the police; (3) acted as his own witness by defining the word "struzy;" and (4) argued that the Facebook messages were about Petitioner.  Dkt. 21 at 8-10.

#### 2.    Applicable Law

Federal habeas review of prosecutorial misconduct claims is limited to the narrow issue of whether the alleged misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986); *see also*

United States District Court
Northern District of California

24

1    *Smith v. Phillips*, 455 U.S. 209, 219 (1982) ("[T]he touchstone of due process analysis in cases of

2    alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor.").

3    Prosecutorial misconduct that rises to the level of a due process violation may provide grounds for

4    granting a habeas petition only if that misconduct had a "substantial and injurious effect or

5    influence in determining the jury's verdict."  *Wood v. Ryan*, 693 F.3d 1104, 1113 (9th Cir. 2012);

6    *see also Brecht*, 507 U.S. at 637-38.

7            There are several factors courts take into account in assessing whether prosecutorial

8    misconduct results in a due process violation: (1) whether the trial court issued a curative

9    instruction, *Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987); (2) the weight of evidence of guilt,

10   *compare United States v. Young*, 470 U.S. 1, 19 (1985) (finding "overwhelming" evidence of

11   guilt) *with United States v. Schuler*, 813 F.2d 978, 982 (9th Cir. 1987) (in light of prior hung jury

12   and lack of curative instruction, new trial required after prosecutor's improper reference to

13   defendant's courtroom demeanor); (3) whether the misconduct was isolated or part of an ongoing

14   pattern, *see Lincoln v. Sunn*, 807 F.2d 805, 809 (9th Cir. 1987); (4) whether the misconduct relates

15   to a critical part of the case, *see Giglio v. United States*, 405 U.S. 150, 154 (1972) (failure to

16   disclose information showing potential bias of witness was critical where prosecution's case rested

17   on credibility of that witness); and (5) whether a prosecutor's comment misstates or manipulates

18   the evidence, *see Darden*, 477 U.S. at 182.

19           Improper statements by a prosecutor during closing arguments can violate due process.

20   *See id.* at 180-81.  A petitioner may be entitled to reversal on the basis of prosecutorial misconduct

21   if (1) the prosecutor made statements that were improper, and (2) if those statements rendered the

22   trial fundamentally unfair.  *Id.* at 181; *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974); *Smith*

23   *v. Phillips*, 455 U.S. at 219 ("the touchstone of due process analysis in cases of alleged

24   prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor").  A

25   petitioner is not entitled to habeas corpus relief in the absence of a due process violation even if

26   the prosecutor's comments were "undesirable, erroneous, or even universally condemned."

27   *Donnelly*, 416 U.S. at 642.  A prosecutorial misconduct claim based on improper statements is

28   decided "on the merits, examining the entire proceedings to determine whether the prosecutor's

United States District Court
Northern District of California

1    remarks so infected the trial with unfairness as to make the resulting conviction a denial of due

2    process." *Johnson v. Sublett*, 63 F.3d 926, 929 (9th Cir. 1995) (internal quotation marks omitted);

3    *see Trillo v. Biter*, 769 F.3d 995, 1001 (9th Cir. 2014) ("Our aim is not to punish society for the

4    misdeeds of the prosecutor; rather, our goal is to ensure that the petitioner received a fair trial.").

5        To grant habeas relief, this Court must conclude that the state court's rejection of the

6    prosecutorial misconduct claims "was so lacking in justification that there was an error well

7    understood and comprehended in existing law beyond any possibility for fairminded

8    disagreement." *Parker v. Matthews*, 567 U.S. 37, 47 (2012) (per curiam) (quoting *Harrington v.

9    Richter,* 562 U.S. at 103). The standard of *Darden* is a very general one that provides courts with

10   more leeway in reaching outcomes in case-by-case determinations. *Parker*, 567 U.S. at 48

11   (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

12                   **3.    Analysis**

13                        a.    **False Evidence**

14       Petitioner claims that the admission of Facebook messages between Killens and Tran was

15   fundamentally unfair and in violation of his rights to due process because the prosecution's

16   characterization of the evidence misrepresented the facts and rendered them false. Dkt. 21 at 7-8.

17       The government's knowing use of false evidence against a defendant violates due process.

18   *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *see Giglio*, 405 U.S. at 153-154. To establish a due

19   process violation based on the government's use of false or misleading testimony, Petitioner must

20   show that "(1) the testimony (or evidence) was actually false, (2) the prosecution knew or should

21   have known that the testimony was actually false, and (3) that the false testimony was material."

22   *United States v. Zuno-Arce*, 339 F.3d 886, 889 (9th Cir. 2003). Materiality is demonstrated when

23   there is a "reasonable likelihood that the false testimony could have affected the judgment of the

24   jury." *United States v. Agurs*, 427 U.S. 97, 103 (1976); *see Giglio*, 405 U.S. at 154; *Napue*, 360

25   U.S. at 271-272.

26       Supported by the record, the state appellate court was not objectively unreasonable upon

27   deciding that the prosecutor did not use the Facebook messages to misrepresent the facts. As

28   stated in its opinion, the state appellate court pointed out that the prosecutor never argued that

United States District Court
Northern District of California

26

Petitioner confessed or implicated Killens:

> Defendant Singh's final argument concerning the Facebook messages is that their admission violated due process because the prosecutor used the messages to misrepresent facts—i.e., to lead the jury believe that defendant Singh had implicated himself in the murders. However, the prosecutor never argued that defendant Singh confessed or implicated Killens. Moreover, at most the Facebook messages suggested that defendant Singh did implicate defendant Killens; they did not suggest that defendant Singh had implicated himself in the murders.

*Singh, et. al.*, 2018 WL 1046260, at *14.

Furthermore, the record shows that the trial court had allowed the Facebook messages to be admitted into evidence, not for the truth of the matter asserted, but only to give context to Killens's statements as consciousness of guilt. 3RT 623. As explained above, the trial court issued a limiting instruction that the messages were not to be considered for the truth of the statements, and the evidence can only be considered against Killens, not Petitioner. 14RT 3903, 3919. The record shows that messages portrayed Killen's state of mind—that Killens believed he needed to get away because he believed Petitioner had implicated him. *See* 12RT 3412-3416. Additionally, based on the jury instructions and the overwhelming evidence against Petitioner, the admitted messages were not material to the case at hand. This also takes into consideration the fact that Killens's belief that Petitioner implicated him for the crime does not suggest Petitioner implicated himself. Thus, the state appellate court was objectively reasonable when it rejected Petitioner's claim that the prosecutor used the messages to misrepresent facts.

### b.   **Making False Statements**

Petitioner claims that the prosecutor made false statements during trial, allegedly stating that Petitioner had been caught with Killens's gun and made admissions to the police. As stated by the state appellate court, "the prosecutor never argued that defendant Singh confessed or implicated Killens." *Singh, et. al.*, 2018 WL 1046260, at *14. The record here does not support Petitioner's claim that the prosecutor made such false statements or arguments. *See* 14RT 3934-3983, 4034-4040 (prosecutor's closing arguments showing that he did not argue that Petitioner confessed or implicated Killens). Therefore, the state appellate court was objectively reasonable

27

1    when it rejected Petitioner's claim relating to the prosecutor making false statements during trial.

2                    c.        **Defining Word "Struzy"/ "Streezy"**

3           Petitioner claims that the prosecutor acted as his own witness by defining the word

4    "streezy" during trial.  Dkt. 21 at 9.  However, Respondent contends that this prosecutorial

5    misconduct claim is unexhausted because Petitioner raised this claim for the first time in a petition

6    for discretionary review.  Dkt. 24-1 at 27-28.

7           On habeas review, a federal court may deny an unexhausted claim on the merits even if it

8    is unexhausted.  28 U.S.C. § 2254(b)(2) (habeas claim may be denied on the merits,

9    notwithstanding the failure of the applicant to exhaust state court remedies); *Cassett v. Stewart*,

10   406 F.3d 614, 624 (9th Cir. 2005).  A federal habeas petition may not be granted unless the

11   petitioner has first exhausted state judicial remedies, either through a direct appeal or in collateral

12   proceedings, by fairly presenting each claim to the highest court of his state. 28 U.S.C. § 2254(b),

13   (c); *Baldwin v. Reese*, 541 U.S. 27, 29 (2004); *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (per

14   curiam). "A petitioner has satisfied the exhaustion requirement if (1) he has 'fairly presented' his

15   federal claim to the highest state court with jurisdiction to consider it, or (2) he demonstrates that

16   no state remedy remains available." *Johnson v. Zenon*, 88 F.3d 828, 829 (9th Cir. 1996) (citations

17   omitted).

18          The Supreme Court has previously held that a claim is not fairly presented to the court if it

19   is raised in a procedural context for the first time on discretionary review to the state's highest

20   court, thus making it unlikely to be considered on the merits.  *Castille v. Peoples*, 489 U.S. 346,

21   351 (1989).  Thus, "a petitioner does not fairly raise an issue if she or he seeks review of the

22   federal claim for the first time on discretionary appeal." *Casey v. Moore*, 386 F.3d 896, 918 (9th

23   Cir. 2004).

24          Here, Petitioner first raises this prosecutorial misconduct claim in his petition for review of

25   the denial of his state habeas petition filed in the California Supreme Court, which summarily

26   denied the petition.  *See* Resp't Ex. 13 at 47-48; Resp't Ex. 14.  Since Petitioner raised this claim

27   for the first time in a petition for discretionary review, it is unexhausted.  Thus, Respondent is

28   correct, but this will not prevent the Court from ruling on this claim.  Under these circumstances,

United States District Court
Northern District of California

28

1   the Court will review Petitioner's unexhausted claim de novo, rather than under the deferential

2   standard of review prescribed by AEDPA.  *See Lewis v. Mayle*, 391 F.3d 989, 996 (9th Cir. 2004)

3   ("De novo review, rather than AEDPA's deferential standard is applicable to a claim that the state

4   court did not reach on the merits.") (citing *Nulph v. Cook*, 333 F.3d 1052, 1056 (9th Cir. 2003).

5       Here, during closing argument, the prosecutor explained that he would first address the

6   circumstantial evidence against Killens and then separately address Petitioner.  14RT 3948.

7   During his argument about the circumstantial evidence and Killens's involvement, the prosecutor

8   described Tran's message as, "he got caught with the same struzy gun you had."  14RT 3948.

9   Neither defense attorney objected, and the prosecutor then began discussing the circumstantial

10  evidence against Petitioner.  14RT 3960.

11      During the first day of pretrial proceedings, Petitioner's trial counsel said, "I don't know

12  what the word struzy means exactly, whether it's a gun or some other thing."  3RT 621.  The next

13  day, Petitioner's trial counsel said, "I'm taking the struzy to mean gun."  4RT 905.  As noted by

14  the state appellate court, Petitioner's "trial counsel explicitly argued that the jury would

15  understand that 'struzy' meant a gun."  *Singh, et. al.*, 2018 WL 1046260, at *11.  Therefore, the

16  prosecutor's decision to define "struzy" to mean a gun was based on a reasonable inference from

17  the evidence that defense counsel also made.  *See Menendez v. Terhune*, 422 F.3d 1012, 1037 (9th

18  Cir. 2005) ("The prosecutor may argue reasonable inferences from the evidence presented, which

19  is precisely what he did here."); *United States v. Necoechea*, 986 F.2d 1273, 1276 (9th Cir. 1993)

20  ("[P]rosecutors must have reasonable latitude to fashion closing argument, and thus can argue

21  reasonable inferences based on the evidence.").

22      Furthermore, the fact that trial counsel did not object to the prosecutor's comment, nor was

23  the issue raised on direct appeal, indicates that the remark does not constitute prosecutorial

24  misconduct.  *See Tan*, 413 F.3d at 1112 (noting that trial counsel did not object to prosecutor's

25  assertion as false or misleading).

26      In determining whether a due process violation occurred, "it is appropriate to consider

27  whether the jury was instructed to decide solely on the basis of the evidence rather than counsel's

28  arguments, and whether the state's case was strong."  *Furman v. Wood*, 190 F.3d 1002, 1006 (9th

1    Cir. 1999) (citing *Darden*, 477 U.S. at 182).  Here, the trial court instructed the jury that

2    "[n]othing the attorneys say is evidence."  14RT 3907.  Since the prosecutor's comment was a

3    reasonable inference from the record, no attorney objected to it, the jury was instructed that

4    counsels' statements were not evidence, and the evidence against petitioner was overwhelming,

5    this comment did not violate due process.

6           Even if misconduct occurred, it did not have a substantial and injurious effect on the jury's

7    verdict under *Brecht*.  *See* 507 U.S. at 637.  In addition to the reasons the argument was not

8    misconduct, the prosecutor's statements occurred while discussing the circumstantial evidence

9    against Killens, not Petitioner.  14RT 3948.  Finally, the trial court instructed the jury that the

10   Facebook messages between Killens and Tran were not admitted for the truth of the statement but

11   to give context to Killens's statement in response, and that Killens's pretrial statements could only

12   be considered against Killens, not against Petitioner.  *See* 14RT 3903, 3919.  Therefore, based on

13   the foregoing, the Court finds meritless this unexhausted prosecutorial misconduct claim.

14          d.      **Argument That Messages Were About Petitioner**

15          Petitioner claims that his rights to due process were violated when the prosecutor argued

16   that the Facebook messages between Killens and Tran were about Petitioner.  However, as noted

17   above, a prosecutor may argue reasonable inferences from the record.  *Menendez*, 422 F.3d at

18   1037; *Necoechea*, 986 F.2d at 1276 (9th Cir. 1993).

19          Here, the state appellate court observed that "the jury could rationally have inferred that

20   the messages referenced defendant Sing's arrest for the murders," because the Facebook messages

21   were exchanged shortly after Petitioner's arrest.  *Singh, et. al.*, 2018 WL 1046260, at *12; 5RT

22   1206.  The prosecutor's arguments that the messages referred to Petitioner were, therefore,

23   reasonable inferences that could have been made from the record, and such arguments did not

24   violate due process. Additionally, as stated above, the jury was subject to a limiting instruction,

25   where the Facebook messages were only considered against Killens, not against Petitioner.

26   Finally, as mentioned above, the evidence against the Petitioner was overwhelming.  For these

27   reasons, even if misconduct had occurred, the prosecution's arguments did not have a substantial

28   and injurious effect on the verdict under *Brecht*.  *See* 507 U.S. at 637-38.

United States District Court
Northern District of California

e.      **Summary**

In sum, the Court finds that the state appellate court's rejection of Petitioner's first prosecutorial claim involving the introduction of false or misleading evidence was not an objectively unreasonable application of clearly established Supreme Court law, and it DENIES this claim.

**C.      Prosecutorial Misconduct—Misrepresenting Testimony on Ballistics Evidence**

**1.      Background**

Petitioner claims that the prosecutor committed misconduct by insinuating that the defense withheld expert testimony regarding ballistics testing from the jury and misstating expert trial testimony, violating his constitutional rights to due process.  Dkt. 21 at 10-11.

The state appellate court summarized the trial court proceedings as follows:

> Defendant Singh first argues that the prosecutor committed misconduct by misrepresenting testimony by Adam Lutz, the forensic scientist who analyzed the bullets and casings found at the scene of the murders, and by trying to elicit certain testimony from Victor Lurz, the forensic evidence technician who had processed the vehicle found at the scene of the shootings.
>
> *a. Proceedings Below*
>
> As noted above, Lutz testified that the five bullets and seven casings he had analyzed had likely been fired from the same gun. However, Lutz could not rule out the possibility that there had been two guns because there was a potential eighth bullet strike. Lutz also testified that it was possible, although "speculative," that the bullet fragment found in Safford's skull was a different type of bullet. Lutz had not analyzed that bullet fragment.
>
> When Lurz testified, the prosecution asked him whether he had sent "some ballistics someplace" at the prosecutor's request. Lurz initially responded that responsibility for sending ballistics evidence to another entity would have fallen on an evidence technician or property technician. Lurz then recalled that at the request of the prosecutor, he had in fact sent "a package or something" to a private crime lab called Forensic Analytical. The prosecutor then asked Lurz to confirm that "the district attorney uses Department of Justice; correct?" After Lurz responded, "For some things, yes," the prosecutor asked Lurz to again confirm that he had "sent this to Forensic Analytical." Lurz replied, "Yes," and again confirmed that he had done so at the prosecutor's request.

During argument to the jury, the prosecutor acknowledged that the ballistics evidence was not "conclusive." The prosecutor then argued that although the five intact bullets Lutz had examined were all .45-caliber "full metal jackets," there was a bullet fragment in Safford's head that could have come from lead bullets. The prosecutor noted, "Possibility." The prosecutor then referred to the bullet found in the trunk of the victims' vehicle, asserting that it "most likely came from a .45-[-]caliber lead bullet," not a full metal jacket bullet, which suggested a second shooter had been using a gun with a different type of ammunition. There was no objection to the prosecutor's argument.

Defendant Killens's trial counsel addressed the same issue during his argument to the jury. He noted that the prosecution had "tried to portray the fragment as a lead bullet or a different type of bullet," but pointed out that the prosecution's own witness, Lutz, had characterized that as "speculative." Defendant Killens's trial counsel noted that Lutz had not examined the bullet fragment and asserted that the prosecution had intentionally "chose not to" have Lutz analyze the fragment in order to support the prosecution's argument that the fragment were from a different type of bullet.

In closing argument, the prosecutor responded to the above argument, stating that Lutz had testified the fragment from Safford's head "had no value." The prosecutor also noted that the defense had a right to have the fragment examined also. The prosecutor pointed out that Victor Lurz had testified he sent the ballistics evidence to a forensic laboratory and referenced "their expert." Defendant Killens's trial counsel objected that this was "not correct," and the trial court sustained the objection. The prosecutor asserted, "It is correct that Victor Lurz said he sent it to [F]orensic [L]aboratory." Defendant Killens's trial counsel requested a "front bar," but the trial court said, "I think you can limit it to that." The prosecutor then continued, reiterating that Lurz had sent ballistics evidence to "[F]orensic [L]aboratory" and noting that Lutz did not work for that lab.

*Singh, et. al.*, 2018 WL 1046260, at *22.

### 2.      Applicable Law

The applicable law with respect to prosecutorial misconduct claims is summarized above. *See supra* Discussion Part IV.B.2.

### 3.      Analysis

The state appellate court found that Petitioner's prosecutorial misconduct claim relating to ballistics evidence did not result in a denial of federal due process, stating as follows:

Defendant Singh now contends the prosecutor committed misconduct by (1) attempting to elicit testimony from Lurz regarding sending ballistics evidence to an outside lab; (2) embellishing Lurz's testimony about what was sent to the outside lab; (3) misrepresenting Lutz's testimony about whether two types of ammunition were found; and (4) insinuating that a defense expert had conducted ballistics testing at the outside lab. Defendant contends the prosecutor thereby placed facts not in evidence before the jury.

The Attorney General notes that there was no objection to the prosecutor's questioning of Lurz about sending ballistics evidence to an outside lab, and no objection to the prosecutor's initial argument about there being two different types of bullets. The Attorney General also asserts that defendant Singh is making a different argument on appeal regarding the prosecutor's later assertions about the outside lab. We will reach the merits of each claim, however, in order to address defendant Singh's ineffective assistance of counsel argument.

We agree that the prosecutor should not have attempted to elicit testimony from Lurz to establish that ballistics evidence had been sent to an outside lab, at least to the extent that the jury was likely to have construed that testimony as suggesting that the defense had tested the ballistics fragments and that the testing had not been favorable to the defense. The record does not support the Attorney General's claim that the prosecutor elicited this testimony in order to argue that the defense *could have* had the ballistics evidence tested, and the record does not indicate that either party intended to actually introduce evidence that the ballistics evidence had been tested by a defense expert. (See *People v. Mooc* (2001) 26 Cal. 4th 1216, 1233–1234; *People v. Earp* (1999) 20 Cal. 4th 826, 859–860.)

We also agree—and the Attorney General concedes—that in closing argument, the prosecutor improperly implied that a defense expert ("their expert") worked at the outside lab that received the ballistics evidence. Although the trial court sustained the objection by defendant Killens's trial counsel that this was "not correct," the prosecutor then reiterated that Lurz had sent ballistics evidence to "[F]orensic [L]aboratory" and noted that Lutz did not work for that lab.

However, we do not agree with defendant Singh's claim that the prosecutor committed misconduct by embellishing Lurz's testimony about what was sent to an outside lab. The prosecutor had asked Lurz, who had testified exclusively about bullet strikes and bullets, whether Lurz had "sent some ballistics someplace." Lurz ultimately testified that he had, in fact, sent a package—clearly referring to ballistics evidence—to Forensic Analytical. Thus, when the prosecutor argued that Lurz had sent ballistics evidence to an outside lab, he did not misstate or embellish the evidence.

United States District Court
Northern District of California

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Although the prosecutor should not have elicited Lutz's testimony about the outside lab and should not have implied that a defense expert worked at that lab, our review of the record demonstrates there is no "reasonable probability that the jury would have reached a more favorable result" absent the improper questioning and argument. (See *Sandoval, supra,* 4 Cal. 4th at p. 184; *Watson, supra,* 46 Cal. 2d at p. 836.) As the Attorney General points out, the ballistics evidence was "circumstantial evidence tending to corroborate the eyewitnesses to the murders." Both Romero and Saxton testified that they saw both defendants with guns and that they saw both defendants shoot the victims. Moreover, the evidence established that both victims were shot in the back of the head and in their backs. This evidence strongly suggested the shootings were committed simultaneously, with two firearms, after the victims had both turned around. As the prosecutor argued at trial, if one victim had been shot first, there would likely have been evidence that the second victim had turned back around to look or had attempted to run away. In light of this evidence, the prosecutor's improper suggestion about possible testing by a defense expert at an outside lab was harmless.

We next consider defendant Singh's claim concerning the prosecutor's comments referring to Lutz's testimony. We do not agree that the prosecutor committed misconduct by asserting that the bullet fragments in Safford's head could have come from lead bullets, because that statement was supported by Lutz's testimony that the bullet fragments appeared to be lead fragments. Lutz did testify that it would be "speculative" for him to conclude that the fragments were from something "other than the full metal jacket bullets" because he had not analyzed them with magnification or the appropriate lighting. However, Lutz also testified that a second gun was "a possibility" because there was evidence of "seven cartridge cases, eight bullet strikes." Based on this testimony, the prosecutor's assertion came within his "wide latitude to vigorously argue his or her case and to make fair comment upon the evidence." (See *Ledesma, supra,* 39 Cal. 4th at p. 726.)

However, the prosecutor did overstate Lutz's testimony by asserting that the bullet fragments in Safford's head "most likely came from a .45[-]caliber lead bullet," not a full metal jacket bullet. Lutz had testified only that he could not rule out the possibility that there had been two guns because there was a potential eighth bullet strike, not that there "most likely" was a second type of bullet. Nevertheless, defendant Singh's trial counsel was not ineffective for failing to object. The record indicates the defense made a tactical decision to address the prosecutor's assertion during argument to the jury. (See *People v. Welch* (1999) 20 Cal. 4th 701, 764 (*Welch* ) ["defense counsel could have legitimately decided that it was tactically wise not to interrupt the prosecutor but to respond . . . during his own closing

argument, as he in fact did"].)

*Singh, et. al.*, 2018 WL 1046260, at *23-24.

After examining all of Petitioner's claims for misconduct individually, the state appellate court explained that "[w]ith respect to the ballistics evidence, the prosecutor's improper questions and comments about testing at an outside lab was harmless in light of the other evidence establishing that both defendants shot the victims." *Id.* at *31.

The state appellate court reasonably determined that while the prosecutor's implication that a defense expert conducted ballistics testing in rebuttal closing argument was improper, it was not the type of "egregious misconduct" that constitutes a deprivation of constitutional due process. *Donnelly*, 416 U.S. at 647-48.

The record shows the trial court had instructed the jury that the attorneys' remarks were not evidence and that it must ignore a question if the court sustains an objection. 14RT 3907-3908. After Killens's attorney objected to the prosecutor's aforementioned remarks on ballistics evidence, the trial court sustained the objection and ordered the prosecutor to limit his argument to Lurz's testimony that he sent the evidence to a forensic laboratory. 14RT 4037. Moreover, as the state appellate court observed, the ballistics evidence was merely circumstantial evidence which supported the testimony of eyewitnesses Romero and Saxton, who both testified that they saw Petitioner and Killens with guns shooting the victims, and the forensic evidence that both victims were shot three times and both were shot in the back of the head and in the back, which strongly suggested that they were shot simultaneously with two guns, as the prosecutor argued. *Singh, et. al.*, 2018 WL 1046260, at *2-3, 5-7, 23-24. Finally, one uninvolved witness testified to hearing 10 to 15 gunshots and another testified to hearing at least five shots followed by a group of three or four shots. 7RT 1861, 1869. Therefore, the jury heard evidence that more than seven shots were fired and thus the jury could have inferred that there were two shooters.

Similarly, the state appellate court reasonably determined that the prosecutor's initial argument that Lutz testified that the bullet recovered from Navneal's head "most likely" came from a .45-caliber lead bullet, not a full metal jacket was an overstatement, but did not violate federal due process. *Singh, et. al.*, 2018 WL 1046260, at *24, 31. Initially, this portion of the

prosecutor's initial closing argument occurred during his discussion of the circumstantial evidence against Killens, which was separate from his argument about the circumstantial evidence against Petitioner.  14RT 3948, 3956, 3960.  In addition, the prosecutor acknowledged that the ballistics evidence was not conclusive by itself but when considered with all of the other evidence, it showed that there were two shooters. 14RT 3954. The prosecutor then discussed at length why the ballistics evidence showed eight bullet strikes and how the autopsies showed that there were two shooters. 14RT 3954-3957.

Neither attorney objected to the argument incorrectly characterizing Lutz's testimony. 14RT 3956.  Instead, Killens's attorney argued as follows:

> I think we have a fundamental disagreement as to what Mr. Lutz testified to. He is a critical witness in this case. So if you have concerns, questions or are confused as to what he testified to, I implore you to read back his testimony. He did not support what they're saying. They tried desperately to get him to basically feed into their hypothetical and their theory of facts, but it didn't work. He was honest. He was a scientist. He said it's just not there.

14RT 4002.  In rebuttal, the prosecutor conceded that Lutz "said that the fragment had no value. Fragment had no value.  That's what he said."  14RT 4037.  Lutz had testified that, "I looked at these and these types of lighting conditions, and it did not look like fragments that have forensic evidentiary value."  12RT 3489.  Lutz had earlier not ruled out the possibility of a second gun based on the evidence from the scene and the victims' bodies showing eight strike points.  12RT 3486-3488.

Thus, Respondent argues that Killens's attorney "effectively attacked the prosecutor's overstatement, which the prosecutor then rectified by accurately characterizing Lutz's testimony in his rebuttal closing argument."  Dkt. 24-1 at 36 (citing *Darden*, 477 U.S. at 182) ("[d]efense counsel were able to use the opportunity for rebuttal very effectively, turning much of the prosecutors' closing argument against them by placing many of the prosecutors' comments and actions in a light that was more likely to engender strong disapproval than result in inflamed passions against petitioner").  This Court agrees with Respondent.  Accordingly, the state appellate court's determination that the prosecutor's initial overstatement did not deprive

36

Petitioner of federal due process was not an objectively unreasonable application of clearly established Supreme Court law.

Petitioner fails to show that the prosecutor's comments had a substantial and injurious effect on the verdict under *Brecht*.  *See* 507 U.S. at 637-38; *Trillo*, 769 F.3d at 1001-02 (prosecutor's single improper comment during a lengthy closing argument did not have a substantial and injurious effect on the verdict).  Here, as explained above, the ballistics evidence circumstantial, the prosecutor corrected his overstatement, the jury was instructed the attorneys' statements were not evidence, and evidence existed from which the jury could infer that there were two shooters and that Petitioner was significantly involved.

Finally, Petitioner contends there was evidence placing a black semiautomatic handgun in Killens's hand at the time of and shortly after the murder.  Dkt. 21 at 11.  To the contrary, Saxton testified that Petitioner had a black semiautomatic and Killens had "an ugly rusted gun that spun." 9RT 2571-2572.  Although he admitted at trial that he agreed it was an "old black-looking rusty revolver" at the preliminary hearing, he consistently described it as an old revolver.  9RT 2573-2574.  Killens's girlfriend testified that over a month after the murders Killens showed her a palm size, silver grayish gun.  10RT 2734-2737.  Shortly before the trial, she gave a statement that it was a semiautomatic.  10RT 2757-2758.  In any event, the Court finds that there was evidence presented at trial from which the jury could infer that there were two shooters and that Petitioner was substantially involved with the murder.

Therefore, the Court finds that the state appellate court's rejection of Petitioner's prosecutorial claim relating to the ballistics evidence was not an objectively unreasonable application of clearly established Supreme Court law, and it DENIES Petitioner's claim.

**D.** **Ineffective Assistance of Counsel— Failing to Object to Prosecutor's Argument Regarding Circumstantial Evidence Jury Instruction**

**1.** **Background**

Petitioner contends that his trial counsel, Scott Erdbacher, Esq., rendered ineffective assistance by failing to object to the prosecutor's argument regarding the circumstantial evidence instruction.  Dkt. 21 at 11-12.

United States District Court
Northern District of California

37

The state appellate court summarized the circumstantial evidence jury instruction and the trial court proceedings as follows:

> The trial court instructed the jury on circumstantial evidence pursuant to CALCRIM No. 224, which told the jury: "Before you may rely on circumstantial evidence to conclude that a fact necessary to find a defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt. Also, before you may rely on circumstantial evidence to find a defendant guilty, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant is guilty. If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions points to innocence and another to guilt, you must accept the one that points to innocence. However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable."

> During argument to the jury, the prosecutor referenced "the circumstantial evidence instruction," asserting, "it's the most reasonable interpretation of the evidence. The most reasonable interpretation." The prosecutor told the jury, "[T]hat's your touch stone. That's your guide post." The prosecutor then discussed the ballistics evidence (as described in the section above) and argued that "[t]he most reasonable interpretation is we had another shooter."

> Neither defendant objected, but trial counsel for defendant Singh addressed the prosecutor's discussion of circumstantial evidence during his own argument to the jury: "The law says it's not the most reasonable interpretation. If there is a reasonable interpretation that points towards innocence and one that points towards guilt, you're required to adopt the one that points towards innocence."

*Singh, et. al.*, 2018 WL 1046260, at *24.

### 2.      Applicable Law

A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). There is a two-prong test applicable to claims for ineffective assistance of counsel. *Id.* at 688. First, the defendant must show "that counsel's representation fell below an objective standard of reasonableness." *Id.*; *see also Hasan v. Galaza*, 254 F.3d 1150, 1154 (9th Cir. 2001). The defendant must overcome a

United States District Court
Northern District of California

strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance which, under the circumstances, might be considered sound trial strategy. *Harrington,* 562 U.S. at 104; *United States v. Molina*, 934 F.2d 1440, 1447 (9th Cir. 1991). "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687.

To satisfy the second prong, the petitioner must establish that he was also prejudiced by counsel's substandard performance. *See Gonzalez v. Knowles*, 515 F.3d 1006, 1014 (9th Cir. 2008) (citing *Strickland*, 466 U.S. at 694). Under *Strickland*, "[o]ne is prejudiced if there is a reasonable probability that but-for counsel's objectively unreasonable performance, the outcome of the proceeding would have been different." *Id.* "The likelihood of a different result must be substantial, not just conceivable." *Harrington*, 562 U.S. at 112. (citing *Strickland*, 466 U.S. at 693). Judicial scrutiny of counsel's performance is "highly deferential." *Strickland*, 466 U.S. at 689. A claim for ineffective assistance of counsel fails if either one of the prongs is not satisfied. *Strickland*, 466 U.S. at 697.

Under AEDPA, a federal court's review of a state court's decision on an IAC claim is "doubly deferential." *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011). The question is not whether counsel's actions were reasonable; rather, the question is whether "there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105; *Bemore v. Chappell*, 788 F.3d 1151, 1162 (9th Cir. 2015) (same). "The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard." *Griffin v. Harrington*, 727 F.3d 940, 945 (9th Cir. 2013) (quoting *Harrington*, 562 U.S. at 101).

It is unnecessary for a federal court considering a habeas ineffective assistance of counsel claim to address the prejudice prong of the *Strickland* test if the petitioner cannot even establish incompetence, sufficient to constitute deficient performance, under the first prong. *See Siripongs v. Calderon*, 133 F.3d 732, 737 (9th Cir. 1998). Likewise, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as the result of the alleged deficiencies. *See Strickland*, 466 U.S. at 697; *Williams v. Calderon*, 52

F.3d 1465, 1470 & n.3 (9th Cir. 1995) (applauding district court's refusal to consider whether counsel's conduct was deficient after determining that Petitioner could not establish prejudice), *cert. denied*, 516 U.S. 1124 (1996).

A difference of opinion as to trial tactics does not constitute denial of effective assistance, *United States v. Mayo*, 646 F.2d 369, 375 (9th Cir. 1981), and tactical decisions are not ineffective assistance simply because in retrospect better tactics are known to have been available. *Bashor v. Risley*, 730 F.2d 1228, 1241 (9th Cir. 1984). Tactical decisions of trial counsel deserve deference when: (1) counsel in fact bases trial conduct on strategic considerations; (2) counsel makes an informed decision based upon investigation; and (3) the decision appears reasonable under the circumstances. *Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994). Furthermore, trial counsel cannot be ineffective for failing to raise a meritless motion. *Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005).

A state appellate court's finding that defense counsel made a tactical decision is a question of fact which the federal habeas court cannot second-guess unless the state court's factual determination was objectively unreasonable. *Edwards v. Lamarque*, 475 F.3d 1121, 1126 (9th Cir. 2007); *see Wood v. Allen*, 558 U.S. 290, 301 (2010) (assuming without deciding that whether counsel made a tactical decision was subject to review under 28 U.S.C. § 2254(d)(2)).

### 3.    Analysis

The state appellate court determined that even if the prosecutor misstated the circumstantial evidence instruction, trial counsel made a reasonable tactical decision not to object but to address circumstantial evidence in his own argument, as explained below:

> The Attorney General contends the prosecutor did not misstate the law, because the circumstantial evidence rule stated in CALCRIM No. 334 only applies " 'when circumstantial evidence is "substantially relied on for proof of guilt," ' " and the rule does not apply "when circumstantial evidence is merely used to corroborate direct evidence. [Citations.]" (*People v. Sandoval* (2015) 62 Cal. 4th 394, 417–418.) The Attorney General points out that here, the prosecution had direct evidence that there were two shooters (i.e., the testimony of Saxton and Romero), and that the ballistics evidence was merely circumstantial evidence corroborating that direct evidence.

> Even assuming that the rule stated in CALCRIM No. 334 applied in this case and that the prosecutor misstated the law during argument to the jury, defendant Singh's trial counsel was not ineffective for failing to object. The record shows that defendant Singh's trial counsel made a tactical decision to address the prosecutor's assertion during argument to the jury rather than interrupt the prosecutor's argument with an objection. (See *Welch, supra,* 20 Cal. 4th at pp. 763–764.) This was a reasonable tactical decision, particularly in light of the trial court's admonition that the jury was required to follow the trial court's instructions—which included CALCRIM No. 334—if the attorneys' comments on the law conflicted with those instructions. (See CALCRIM No. 200.)

*Singh, et. al.*, 2018 WL 1046260, at *24-25.

Here, the record shows that Petitioner's trial counsel discussed circumstantial evidence in his closing argument and gave an example of a situation where circumstantial evidence tended to show guilt, but the person was actually innocent. 14RT 3992-3993. He then argued that "[i]f there is a reasonable interpretation that points towards innocence and one that points towards guilt, you're required to adopt the one that points towards innocence." 14RT 3992-3993. The record supports the state appellate court's reasonable finding that trial counsel made a tactical decision not to object to the prosecutor's argument, but to discuss the circumstantial evidence instruction in his own closing argument. *See Demirdjian v. Gipson*, 832 F.3d 1060, 1072-1073 (9th Cir. 2016) (state court could have reasonably presumed that defense counsel made reasonable tactical decision to address prosecution's closing arguments in his own closing argument instead of objecting); *Cunningham v. Wong*, 704 F.3d 1143, 1159 (9th Cir. 2013) (defense counsel's decision not to object to prosecutor's closing argument comments, "possibly to avoid highlighting them," was a reasonable strategic decision).

The Court further finds that Petitioner has failed to show that the lack of an objection deprived him of a fair trial. *See Strickland*, 466 U.S. at 693. Here, the trial court instructed the jury that "If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions," and gave the jury a copy of the written instructions to take into the jury room. 14 RT 3904-3905. In addition, Petitioner's trial counsel gave a compelling example of circumstantial evidence leading to the wrong conclusion after the prosecutor's challenged argument.

41

14RT 3992-3993. Finally, as mentioned above, there was overwhelming evidence of Petitioner's guilt. *See Featherstone v. Estelle*, 948 F.2d 1497, 1507 (9th Cir. 1991) (holding on habeas review that counsel's failure to object to improper argument at trial did not prejudice petitioner where other evidence supported a guilty verdict and the jury was told closing argument was not evidence).

Accordingly, no basis exists for this Court to conclude that the state appellate court's rejection of Petitioner's IAC claim—based on trial counsel's failure to object to the prosecutor's argument regarding the circumstantial evidence instruction—was an objectively unreasonable application of clearly established federal law. *See Harrington*, 562 U.S. at 101. Accordingly, the Court DENIES this IAC claim.

### E.    Prosecutorial Misconduct—Misrepresenting and Eliciting Inadmissible Evidence in the Form of Text Messages

#### 1.    Background

Petitioner claims that the prosecutor committed misconduct by making a remark during opening statements attributing a text message authored by Navneal to Petitioner, violating the trial court's *in limine* ruling by eliciting evidence of Navneal's texts, and arguing inflammatory inferences from the texts. Dkt. 21 at 12-13.

The state appellate court summarized the trial court proceedings and determined that the prosecutor did not commit misconduct in violation of due process, stating as follows:

> Defendant Singh contends the prosecutor committed misconduct with respect to certain text messages. He contends the prosecutor (1) misrepresented facts to the trial court during a motion in limine; (2) told the jury about certain text messages in violation of the in limine ruling; and (3) introduced evidence that violated the in limine ruling.
>
> *a. Proceedings Below*
>
> The text messages at issue were first referenced in the prosecution's trial brief, which contained a summary of the facts. The factual summary described an incident prior to the murders, in which Navneal and defendant Singh were in a car stopped by police. After the police found a gun, Navneal told the police the gun belonged to defendant Singh.
>
> The prosecution's trial brief next described events on the day of the murders and indicated that cell phone records would show defendant

42

Singh traveling from Sacramento with Navneal and Safford on the day of the murder. The trial brief stated that during the drive, defendant Singh had called Saxton to say that the planned home invasion robbery "was going down" that day. Defendant Singh had gone to Killens's home and waited for Saxton to pick them up. While waiting, defendant Singh had texted Navneal to "secure a gun to be used in the robbery." The text asked, "What brand is they bruth?" Navneal had texted back, "Slide."

The parties discussed the text messages during a hearing on the motions in limine, which included a motion to exclude all statements by Safford and Navneal. The trial court asked the prosecution if any statements by the victims would be offered. One of the prosecutors responded that Navneal had made statements during the incident when a gun was found in a car. However, since the trial court had indicated that the prior gun incident was not admissible, the prosecutor represented, "[T]hat will not be an issue." The trial court confirmed, "So if that's the only statement that you are proposing as to Navneal Singh, then this motion would be granted." The other prosecutor responded, "Agreed."

During opening statements, one of the prosecutors told the jurors that they would see text messages sent and received on the day of the shootings. According to the prosecutor, defendant Singh had been waiting for a call from Navneal "about the gun" and had sent a text message to Navneal asking, "What brand is they, bro?" Navneal had sent "a response" to defendant Singh.

The text messages themselves were introduced during the testimony of investigator Peter Austen. Austen had created a spreadsheet of cell phone data that included text messages and phone calls exchanged between defendant Singh and Navneal on the day of the murders. At 5:53 p.m., Navneal had texted defendant Singh, "What brand is they bro?" At 6:02 p.m., defendant Singh had texted Navneal, "Yuup." At 6:10 p.m., Navneal had texted defendant Singh, "Slide." Austen explained that "slide" is a nickname for a semiautomatic weapon. There was no defense objection to the testimony or exhibit.

On cross-examination, Austen was asked about the text messages. He was asked whether the text message saying "Slide" appeared to be a response to a previous text message. Austen testified, "It could be an answer. Because there are telephone calls between the messages. So it could be based on a telephone call that they had and he responded back via text later." He acknowledged that the messages "What brand is they bro" and "Slide" both came from the same person. He also acknowledged that "slide" is commonly used to mean "leave or come."

43

When the parties later discussed the admissibility of various exhibits, the prosecution indicated it was seeking to admit the actual cell phone records, which the parties had stipulated to, as well as a summary of the records. Trial counsel for defendant Killens objected to the summary, but the trial court ruled the summary was admissible.

During argument to the jury, the prosecutor described the two text messages from Navneal to defendant Singh as "significant." The prosecutor referred to the text message asking "what brand is it bro" and the later text stating "Slide." The prosecutor asked, "So what are they talking about? They're talking about a gun. Navneal has got a gun. He's going to give it to [defendant Singh]." The prosecutor acknowledged that taken alone, the text messages did not "make sense," but reminded the jury that there had been phone calls in between the two messages.

*Singh, et. al.*, 2018 WL 1046260, at *25-26.

### 2. Applicable Law

The applicable law with respect to prosecutorial misconduct claims has been summarized above. *See supra* Discussion Part IV.B.2.

### 3. Analysis

With regard to this final prosecutorial misconduct claim relating to the text messages, the state appellate court determined that the prosecutor did not commit misconduct in violation of due process. The state appellate court explained its reasoning as follows:

Defendant Singh asserts the prosecutor violated the trial court's in limine order by eliciting evidence about Navneal's texts, failing to redact Navneal's texts from the spreadsheets, and mentioning the texts in opening statement and argument to the jury. As the Attorney General points out, however, the trial court's in limine ruling did not encompass Navneal's text messages. The in limine ruling only precluded the prosecution from introducing the statements Navneal had made during the incident when a gun was found in a car. "Although it is misconduct to elicit or attempt to elicit inadmissible evidence in violation of a court ruling [citation]," the trial court had not ruled on the admissibility of the text messages and no objection was raised. (*People v. Silva* (2001) 25 Cal. 4th 345, 373.) Thus, prosecutor "violated no court ruling." (*Ibid.*)

Defendant Singh next argues that the prosecutor committed misconduct by indicating, in its trial brief and during opening statements, that defendant Singh had sent the text message asking about the "brand." Defendant Singh points out that the evidence at trial showed the text message referencing a "brand" was actually

44

written by Navneal *to* defendant Singh. As the Attorney General concedes, the prosecutor misspoke. We will assume that even if the misstatements were inadvertent, they constituted "'prosecutorial error.'" (*People v. Jasso* (2012) 211 Cal. App. 4th 1354, 1362 (*Jasso*) ["the rubric of prosecutorial misconduct embraces a prosecutor's inadvertent and negligent objectionable statements to the jury"]; cf. *Fuiava, supra,* 53 Cal. 4th at p. 691 [indicating that prosecutorial misconduct does not include "an inadvertent misstatement"].) However, in light of the fact that the evidence showed that Navneal sent the text message, there is no "'reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.'" (*Cunningham, supra,* 25 Cal. 4th at p. 1001.)

Last, defendant Singh contends the prosecutor asked both the jury and the trial court to "draw an irrational, speculative, and inflammatory inference" from the text messages, apparently because the prosecutor argued that the messages showed that Navneal was going to give defendant Singh a gun. In light of Austen's testimony that "slide" is a nickname for a semiautomatic weapon, the prosecutor's argument was "'founded on the evidence in the record and fell within the permissible bounds of argument.' [Citations.]" (*Fuiava, supra,* 53 Cal. 4th at p. 692.)

*Singh, et. al.*, 2018 WL 1046260, at *26.

After examining all of Petitioner's prosecutorial misconduct claims together, with respect to the text message authorship error in opening statement, the state appellate court explained that "although the prosecutor initially attributed a text message to defendant Singh, the evidence showed that Navneal actually sent the text message and thus it was not reasonably probable that the jury would have believed the message was sent by defendant Singh." *Id.* at *30-31.

The record shows that during trial, the prosecutor correctly identified the sender of the text as Navneal when questioning Investigator Austen, who answered affirmatively.  12RT 3441.  In closing argument, the prosecutor correctly identified Navneal as the sender of the text asking about the brand and explained that if it did not make sense that Navneal was asking what brand it was, there were also phone calls occurring between the text messages.  14RT 3968-3969.  Thus the misstatement during opening statements occurred on March 27, 2015, and the closing argument which correctly identified the sender occurred two weeks later on April 9, 2015.  3 Augmented Reporter's Transcript ("ART") 744; 14RT 3968.  The exhibit properly identified the sender as Navneal and the jury had the exhibits in the jury room.  1ACT 25, 14RT 4041. The trial

court additionally instructed the jury that nothing the attorneys say is evidence.  14RT 3907.
Based on the facts above, this Court finds that the state appellate court reasonably determined that
the prosecutor's erroneous remark during opening statements was not the type of "egregious
misconduct" that constitutes a deprivation of constitutional due process.  *See Donnelly*, 416 U.S.
at 647-48.

Furthermore, the state appellate court's factual finding that the prosecutor did not violate
an *in limine* ruling by introducing the text messages has not been rebutted by clear and convincing
evidence.  *See* 28 U.S.C. § 2254(e)(1).  As noted above, where the state court's factual findings
are at issue in a habeas proceeding, the district court must first conduct an "intrinsic review" of its
fact-finding process.  *See Taylor v. Maddox,* 366 F.3d 992, 999-1000 (9th Cir. 2004), *abrogated
on other grounds*, *Murray v. Schriro*, 745 F.3d 984, 1000 (9th Cir. 2014).  "[A] decision
adjudicated on the merits in a state court and based on a factual determination will not be
overturned on factual grounds unless objectively unreasonable in light of the evidence presented in
the state-court proceeding."  *Miller-El*, 537 U.S. at 340; *see also Cavazos v. Smith*, 565 U.S. 1, 2
(2011) (per curiam) (it is not the province of the district court on federal habeas review to reassess
issues of credibility or to reweigh the evidence).  However, the salient question under section
2254(d)(2) is whether the state appellate court, applying the normal standards of appellate review,
could reasonably conclude that the trial court's findings are supported by the record.  *See Lambert
v. Blodgett*, 393 F.3d 943, 978 (9th Cir. 2004).

Here, during pretrial proceedings, the trial court discussed a defense motion *in limine* to
exclude statements by Safford and Navneal.  *See* 4RT 937-938.  The prosecutor who argued
against the defense motion at that hearing clarified that the motion was based on an incident in
which Navneal, Petitioner, and another person were pulled over in a car and Navneal told the
police that the gun they had was Petitioner's.  4RT 938.  The trial court ruled that it would not
allow that statement to be admitted and asked, "So if that's the only statement that you are
proposing as to Navneal Singh, then this motion would be granted. Okay?"  The prosecutor at the
hearing responded, "Agreed."  4RT 938.  At trial, neither defense counsel objected to the

46

prosecutor's opening statement describing the texts between Navneal and Singh from the day of the murders. 3ART 744. People's exhibits 98-101 were summaries of calls and texts between five of the six participants on the afternoon and evening of the murders. 1ACT 24-26. During a break shortly after the prosecution marked People's exhibits 98-101 for identification, the trial court and parties discussed a variety of evidentiary issues outside the presence of the jury, yet neither defense counsel objected to them. 12RT 3425-3426, 3429-3435. Neither defense counsel objected while the prosecutor questioned Investigator Austen about People's exhibits 98-101. 12RT 3437-3443. Although Killens's attorney objected to the admission of People's exhibits 98-101 under California Evidence Code § 352, he did not claim they violated the trial court's *prior in limine* ruling. 13RT 3696. The prosecutor argued that the exhibits were admissible as summaries of voluminous records, explained that the full phone records were contained on a DVD, and that all parties had stipulated to the admission of that DVD as Exhibit 173. 13RT 3696-3697. The trial court admitted the summaries over objection. 13RT 3699-3700. The discussion at the *in limine* ruling and the lack of any objection when evidence of the text messages and People's exhibits 98-101 were introduced supports the state appellate court's finding, as stated above, that the *in limine* ruling was limited to the statements Navneal made when a gun was found in a car.

Thus, the record demonstrates that Petitioner had a full, fair and complete opportunity to argue the basis of this claim during the motion *in limine* hearings before the trial court. Therefore, the Court finds that the state court's fact-finding process outlined above survives intrinsic review. *See Hibbler v. Benedetti*, 693 F.3d 1140, 1146 (9th Cir. 2012) (noting that "a federal court may not second-guess a state court's fact-finding process unless, after review of the state-court record, it determines that the state court was not merely wrong, but actually unreasonable") (quoting *Taylor*, 366 F.3d at 999). "Once the state court's fact-finding process survives this intrinsic review . . . the state court's findings are dressed in a presumption of correctness. . . ." *Taylor*, 366 F.3d at 1000. "AEDPA spells out what this presumption means: State-court fact-finding may be overturned based on new evidence presented for the first time in federal court only if such new evidence amounts to clear and convincing proof that the state-court finding is in error." *Id.* (citing 28 U.S.C. § 2254(e)(1)). On federal habeas review, the trial court's aforementioned finding at the

motion *in limine* hearing is entitled to deference under section 2254(d)(2).  Petitioner fails to present clear and convincing evidence sufficient to overcome the presumption of correctness of the trial court's factual findings, and, therefore, the state appellate court reasonably determined the prosecutor did not commit misconduct by violating a court order.

Finally, the state appellate court reasonably determined that the prosecutor's argument that the text messages showed that Navneal was going to give Petitioner a gun was permissible based on evidence in the record.  Investigator Austen testified that "slide" is a nickname for a semiautomatic weapon.  12RT 3442.  Thus, the prosecutor properly argued that when Navneal texted "slide" to petitioner, they were talking about a gun.  14RT 3968.  *See Menendez*, 422 F.3d at 1037; *Necoechea*, 986 F.2d at 1276.  That Saxton and Romero both testified that Petitioner fired many shots from a gun that Navneal had just handed him further supports the state appellate court's ruling.  8RT 2319-2326; 10RT 2818-2824, 2827.

Accordingly, the state appellate court's decision denying Petitioner's challenge to the alleged prosecutorial misconduct relating to the aforementioned text messages were not contrary to, or an unreasonable application of, clearly established Supreme Court precedent, nor were they based on an unreasonable determination of the facts in light of the evidence presented.  *See* 28 U.S.C. § 2254(d)(1), (2).  Therefore, Petitioner is not entitled to relief on his final prosecutorial misconduct claim, and it is DENIED.

### F.  Ineffective Assistance of Counsel—Failing to Object to Prosecutor's "Lesser Criminals" Remarks

#### 1.  Background

Petitioner claims that the prosecutor improperly "traded on the prestige and expertise of [his] office" by claiming to have determined who the "lesser criminals" were in this case, and that trial counsel rendered ineffective assistance by failing to object.[13]  Dkt. 21 at 13-14.

---

[13] In this IAC claim, Petitioner suggests under his "Supporting Facts" section that "[t]he prosecution interjected facts not in evidence four times."  Dkt. 21 at 13.  However, in the title of this IAC claim, Petitioner only refers to the "lesser criminals" aspect of the prosecutor's argument.  *See id*.  Habeas Rule 2(c) requires that a habeas petition "'specify all the grounds for relief available to the petitioner'" and "'state the facts supporting each ground.'"  *See also Mayle v.*

48

The state appellate court summarized the background involving the prosecutor's remarks about "lesser criminals" as well as the related the trial court proceedings as follows:

> *a. Proceedings Below*
>
> The prosecutor's remarks about "lesser criminals" and "lesser players" came in the context of a discussion about whether the jury should believe Saxton and Romero. The prosecutor acknowledged that both Saxton and Romero had admitted to having previously been untruthful and that both had been granted immunity, which was "leniency." The prosecutor explained that the District Attorney's Office "deals with many criminal situations where in order to get a more serious crime solved we have to give some concessions to lesser criminals . . . . And I think you can understand in this situation how important it was to get these two killers convicted, . . . how we had to give some leniency to lesser players in this case."

*Singh, et. al.*, 2018 WL 1046260, at *28.

### 2.   Applicable Law

The applicable law with respect to ineffective assistance of counsel claims is summarized above.  *See supra* Discussion Part IV.D.2.

### 3.   Analysis

As mentioned, the "lesser criminals" aspect of the prosecutor's closing argument occurred in the context of a discussion about the credibility of Saxton and Romero, which is included in its entirety below:

> This last one I want to focus on, how reasonable is the testimony when you consider all the other evidence in this case? These are touch stones for you to grab onto to give you some assurance that you can believe the witnesses Saxton and Romero. Did the witness admit to being untruthful? Yeah. They admit it. We're up front with this. Was immunity leniency? Of course. We make no apology for this, by the way. Our office deals with many criminal situations where in order to get a

---

*Felix*, 545 U.S. 644, 649, 655 (2005).  "Courts generally do not decide issues not raised by the parties." *Galvan v. Alaska Dep't of Corr.*, 397 F.3d 1198, 1204 (9th Cir. 2005). Thus, although the state appellate court opinion discusses three other remarks by the prosecutor, this Court only addresses the IAC claims as it relates to the "lesser criminals" aspect of the prosecutor's argument, which is the only remark raised under this IAC claim in his amended petition. *See* Dkt. 21 at 13-14.

more serious crime solved we have to give some concessions to lesser criminals. It's a fact of life. It's what we do. Many times we don't, but sometimes you have to. And I think you can understand in this situation how important it was to get these two killers convicted, how we had to do this, how we had to give some leniency to lesser players in this case.

14RT 3945-3946.  Even if trial counsel had failed to object to the prosecutor's arguments at closing outlined above, Petitioner must make a showing that trial counsel's failure to object fell outside the bounds of reasonably competent professional assistance, or that he was prejudice by counsel's failure to interpose an objection.  *See Strickland*, 466 U.S. at 688, 694.

After noting that Petitioner did not object to the "lesser criminals" aspect of the prosecutor's argument, the state appellate court determined that trial counsel was not ineffective for failing to object because the prosecutor did not improperly invoke the prestige of his office. *Singh, et. al.*, 2018 WL 1046260, at *28-30.  The state appellate court determined that "[b]y referring to Saxton and Romero as 'lesser criminals' and 'lesser players,' the prosecutor was arguing the evidence, which showed that Saxton and Romero were not the actual shooters." *Id.* at *30.  Additionally, the state appellate court rejected Petitioner's IAC claim relating to this remark because it concluded that "trial counsel could have reasonably decided that any objections to the prosecutor's remarks were not likely to be sustained." *Id.*

The state appellate court reasonably determined that the prosecutor's argument was properly based on the evidence.  This evidence showed that although Saxton and Romero had potential criminal liability, such liability could not have been equivalent to the liability of actual perpetrators because they were not the actual shooters.  Specifically, the record showed that Saxton and Romero agreed to participate in a home invasion robbery, that Saxton drove Petitioner and Killens back to Seaside after the murders, and that Petitioner spent the night with Romero at Romero's mother's house.  8RT 2304-2305, 2325-2327, 2336, 10RT 2829-2832, 2843, 11RT 3030.  Saxton testified that he had been given immunity to testify.  8RT 2335.  Romero testified that he was in a witness protection program through which he was receiving financial help with rent and food until the trial was over, and that he received a deal on pending charges of possession of stolen computers and possession for sale of narcotics.  10RT 2883, 2838-2840.  Thus, the state

United States District Court
Northern District of California

appellate court reasonably determined that the prosecutor was not improperly invoking the prestige of his office but was simply explaining why Saxton and Romero received immunity and other concessions. *See Boyde v. California*, 494 U.S. 370, 385 (1990) (the arguments of counsel "must be judged in the context in which they [were] made.").

In any event, even if trial counsel failed to object, Petitioner has failed to make any showing that any objection—assuming it would have been sustained—would have altered the jury's decision to convict Petitioner. *See Jackson v. Brown*, 513 F.3d 1057, 1082 (9th Cir. 2008) ("[E]ven if [counsel's] failure to object was deficient, we cannot find that, but for his errors, there is a reasonable probability that the jury would not have still convicted [the petitioner].""). Furthermore, in the context of the overwhelming evidence against Petitioner at trial, there was no reasonable likelihood that such a comment by the prosecutor made a difference in the outcome of the trial. As a result, the state appellate court reasonably concluded that trial counsel's failure to object to the prosecutor's aforementioned remark was not prejudicial under *Strickland*. *See Singh, et. al.*, 2018 WL 1046260, at *28-30. Because the state appellate court did not unreasonably apply *Strickland*, relief on this IAC claim is DENIED.

### G.    Cumulative Error

Petitioner argues that the cumulative effect of the errors violated his right to a fair trial. Dkt. 21 at 14-15. The state appellate court determined that the cumulative effect of any trial errors did not violate due process, stating as follows:

> Both defendants contend that even if no one of the alleged trial errors was prejudicial, there was cumulative prejudice. (See *Hill, supra,* 17 Cal. 4th at p. 844 ["a series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error"].) Although we have noted a few instances of prosecutorial error, we found no prejudice from the individual instances, and we find no prejudice from the cumulative effect of those prosecutorial errors. Having found no other trial errors, there can be no cumulative prejudice.

*Singh, et. al.*, 2018 WL 1046260, at *31.

In some cases, although no single trial error is sufficiently prejudicial to warrant reversal, the cumulative effect of several errors may still prejudice a defendant so much that his conviction

51

must be overturned.  *Alcala v. Woodford*, 334 F.3d 862, 893-95 (9th Cir. 2003).  However, where there is no single constitutional error existing, as in this case, nothing can accumulate to the level of a constitutional violation.  *Hayes v. Ayers*, 632 F.3d 500, 524 (9th Cir. 2011).  Accordingly, we find that the Court of Appeal was reasonable in its rejecting Petitioner's claim for cumulative error, and Petitioner is not entitled to relief.  Petitioner's cumulative error claim is DENIED.

### H.    Prosecutorial Error

Lastly, Petitioner claims that pervasive prosecutorial error combined to deprive him of a fair trial.  Dkt. 21 at 15-16.

The state appellate court determined that the combined effect of the prosecutorial errors did not violate federal due process, reasoning as follows:

> Defendant Singh contends the prosecutorial misconduct in this case "so infect[ed] the trial with unfairness" that his convictions were a denial of due process. Defendant Singh asserts that the record shows the prosecutor "did whatever was necessary to gain favorable rulings from the court and to bias the jury against the defendants."
>
> The record does not support defendant Singh's description of the prosecution's efforts to obtain convictions in this case. As we have detailed, defendant Singh's individual claims of prosecutorial misconduct are without merit or were not prejudicial. With respect to the ballistics evidence, the prosecutor's improper questions and comments about testing at an outside lab was harmless in light of the other evidence establishing that both defendants shot the victims. Even if the prosecutor misstated the circumstantial evidence instruction, it was not reasonably probable that the jury would have misunderstood the law of accomplice testimony in light of the trial court's instructions and defense arguments. Similarly, although the prosecutor initially attributed a text message to defendant Singh, the evidence showed that Navneal actually sent the text message and thus it was not reasonably probable that the jury would have believed the message was sent by defendant Singh. There was no prosecutorial misconduct with respect to the prosecutor's questions and arguments concerning Alexander, and no prosecutorial misconduct with respect to the prosecutor's arguments about "lesser criminals," "tricks," the "stupid things" criminals do, and how "[p]eople like these" kill to show they are powerful. Finally, the prosecutor corrected his initial representation about the Facebook messages, which in any event did not affect the trial court's ruling and did not go before the jury.

> In sum, this is not a case in which the prosecutor committed errors that " ' "so infect[ed] the trial with unfairness as to make the resulting conviction a denial of due process." ' [Citations.]" (*Cunningham, supra,* 25 Cal. 4th at p. 1000.)

*Singh, et. al.*, 2018 WL 1046260, at *31.

Here, the Court has previously discussed above why the state appellate court reasonably determined that the prosecutor's conduct (described above in Petitioner's claims relating to prosecutorial misconduct) did not violate federal due process. For the same reasons, the Court finds that the state appellate court reasonably determined that pervasive prosecutorial error did not violate Petitioner's rights to due process and a fair trial. As this Court has determined in rejecting his cumulative error claim, where there is no single constitutional error (or, as in this case, no merit to any of Petitioner's prosecutorial misconduct claims), nothing can accumulate to the level of a constitutional violation. *See Hayes*, 632 F.3d at 524. Therefore, Petitioner's claim relating to pervasive prosecutorial misconduct is DENIED.

## V.    CERTIFICATE OF APPEALABILITY

No certificate of appealability is warranted in this case. For the reasons herein, jurists of reason would not find this Court's denial of Petitioner's claims debatable or wrong. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Petitioner may not appeal the denial of a Certificate of Appealability in this Court but may seek a certificate from the Ninth Circuit under Rule 22 of the Federal Rules of Appellate Procedure. *See* Rule 11(a) of the Rules Governing Section 2254 Cases.

## VI.    CONCLUSION

For the reasons outlined above, the Court orders as follows:

1.    All claims from the amended petition are DENIED, and a certificate of appealability will not issue. Petitioner may seek a certificate of appealability from the Ninth Circuit Court of Appeals.

2.    The Clerk shall terminate any pending motions and close the file.

IT IS SO ORDERED.

Dated:  12/11/2020

_____
YVONNE GONZALEZ ROGERS
United States District Judge